Amado SALAZAR–CALDERON, et al., Plaintiffs-Appellants, Cross-Appellees,

v.

PRESIDIO VALLEY FARMERS ASSOCIATION, et al., Defendants-Appellees, Cross-Appellants.

No. 84–1163.

United States Court of Appeals, Fifth Circuit.

July 25, 1985.

---

Edward J. Tuddenham, Tex. Rural Legal Aid, Hereford, Tex., David Hall, Weslaco, Tex., for plaintiffs-appellants, cross-appellees.

Robert A. Skitol, Washington, D.C., for amicus Farmworker Justice Fund.

Thomas Bacas, Washington, D.C., for defendants-appellees, cross-appellants.

Before THORNBERRY, RUBIN and HIGGINBOTHAM, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

This case presents claims by 492 Mexican nationals against the Presidio Valley Farmers Association and its grower members who employed them during the 1977 harvest season. Plaintiffs allege that defendants violated the terms and conditions of their employment agreement, terms set, for the most part, by federal law, as well as numerous provisions of the Farm Labor Contractor Registration Act.

The plaintiffs prevailed below, but appeal arguing that the district court erred in determining the terms of their employment agreement and in assessing damages. The plaintiffs also ask us to reverse the district court's refusal to certify this case as a class action, and, in the event we also refuse, ask us to reverse its decision that the claims of certain plaintiffs are barred by limitations. Defendants cross appeal, arguing that the district court erred in assessing any liability at all. We find defendants' cross-appeal to be without merit, but conclude that plaintiffs' challenges demonstrate, at least in part, reversible error.

We affirm in part, reverse in part, and remand.

## I

The Presidio Valley of Texas is a small but fertile agricultural region situated along the Rio Grande approximately 200 miles downstream from El Paso and directly across the border from Ojinaga, Chihuahua. Its principal crops include onions, melons, chile peppers and cotton. Illegal aliens from Ojiniga and neighboring Mexican territory have long been the primary source of labor for the Valley's farms.

The circumstances that gave rise to this controversy began in early 1977, when the Immigration and Naturalization Service informed growers in the Valley that it intended to step up its enforcement activity in the area. Aware that the effect of such enforcement would be to cut off labor needed for the 1977 harvest, the growers investigated INS's H–2 visa program. Under H–2, INS may issue visas to aliens for temporary employment in the United States upon petitions of the importing employer. *See* 8 U.S.C. §§ 1101(a)(15)(H), 1184(c).[1] We describe first the aspects of the H–2 visa program applicable to the issues before us, and then turn to defendants' use of that program during the 1977 harvest season.

–1–

The regulations implementing INS's authority to issue H–2 visas require applications by the petitioning employer to be accompanied by a certification from the Secretary of Labor that U.S. workers are not available for the work and that employment of the alien workers will not adversely affect workers in the U.S. *or* a notice stating that such certification cannot be made. 8 C.F.R. 214.2(h)(3). The Department of Labor has in turn set forth minimum standards of employment and procedures that must be followed before it will issue its certifications for H–2 petitions.

In 1977, those regulations were codified at 20 C.F.R. §§ 602.10–602.10b; essentially the same regulations are currently codified at 20 C.F.R. § 655.202–207 (1984). Basically, the DOL regulations require an employer seeking certification for alien farmworkers first to attempt to recruit U.S. workers by circulating job notices known as "clearance orders" among the state and local employment bureaus. To ensure that the employment of aliens under H–2 will not adversely affect the working conditions of similarly employed U.S. workers, the regulations further require that the petitioning employer offer specific terms of work including housing, meals, free tools, a written contract, a guarantee of work or wages for three-fourths of the contract period, and a special wage known as the adverse effect wage rate. 20 C.F.R. §§ 602.10a–602.10b (1977).

Regardless of whether or not DOL certifies the petition of the importing employer, INS makes the final decision on the issuance of the H–2 visa petitions. Where no certification is provided by DOL, however, the petitioning employer must "present countervailing evidence [to the INS] that qualified persons in the U.S. are not available and that the employment policies of the Department of Labor have been observed." 8 C.F.R. § 214.2(h)(3). As will be explained, *infra*, we interpret this regulation to mean that the employment conditions mandated by the DOL regulations must be offered to aliens to be employed through the H–2 program unless the INS Commissioner decides that some or all of DOL's conditions will not be required.

---

1. Section 1184(c) of Title 8 provides:

    The question of importing any alien as a nonimmigrant under section 1101(a)(15)(H) ... of this title in any specific case or specific cases shall be determined by the Attorney General, after consultation with appropriate agencies of the Government, upon petition of the importing employer. Such petition shall be made and approved before the visa is granted. The petition shall be in such form and contain such information as the Attorney General shall prescribe....

    The Attorney General has delegated to the INS Commissioner the responsibility for granting such petitions. *See* 8 U.S.C. § 1103.

-2-

The growers in the Valley did not petition for the H-2 visas individually, but instead formed an association, the Presidio Valley Farmers Association, for that purpose. The PVFA's thirty-three members ranged from small family farmers to large corporate agribusinesses, but all shared a common goal—the creation of a pool of legal alien labor in the Valley. The growers combined forces so that the administrative tasks necessary to obtain the visas from INS could be achieved more easily and more rapidly, and thus relieved individual growers of the recruiting and application responsibilities they otherwise would have faced.

For example, the PVFA, rather than the individual growers, determined the terms and conditions of employment which all Association members would offer. PVFA then filed the required clearance orders with the Texas Employment Commission and circulated advertisements offering the employment in both Texas and Mexico. PVFA then requested DOL to issue certification for its H-2 visa petitions.

DOL refused to certify the petitions, however, primarily on the ground that there was insufficient housing available in the Valley to accommodate migrant workers. DOL also considered the terms of employment offered by PVFA to be insufficient under its regulations. For example, DOL sought to require PVFA to pay its workers an AEWR of $2.83 per hour, but the PVFA repeatedly offered to pay only the minimum wage, $2.20 per hour; and the PVFA failed to offer its workers the required ¾ work guarantee for the terms of their visas.

Despite DOL's refusal to certify the petitions, PVFA urged INS to grant the visas, explaining that the lack of worker housing in Presidio was not a real problem because nearly all of the workers to be employed under the visas could easily commute daily from their homes in Ojinaga. It is unclear from the record precisely what other issues were discussed with INS, but on June 9, 1977, acting INS Commissioner Mario Noto approved PVFA's petition for 809 visas for Mexican nationals to work in the Valley during the 1977 harvest season.[2] The visa petitions offered, *inter alia*, 40–60 hours of work per week for the workers at the minimum wage and a transportation allowance for each worker of $5.00 per week.

-3-

This case presents allegations by the alien workers employed in the Valley under the H-2 visa program that PVFA and its members violated the terms of their employment contracts with the workers, as well as numerous sections of the Farm Labor Contractor Registration Act, 7 U.S.C. § 2041 *et seq.* (repealed 1982), during the 1977 harvest season. The suit was originally commenced as a number of separate class actions, all filed in the Western District of Texas, some of which were based in contract and others which were based on alleged violations of the FLCRA. The actions were eventually consolidated under the *Salazar* heading.

As noted above, the plaintiffs' claims were of basically two varieties: contract claims and claims for violations of the FLCRA. The contractual theory was, in short, as follows. The PVFA, in offering visas to the plaintiffs, offered them a contract of employment for the duration of the visas. The terms of the contract were the conditions of employment included in the visa petitions and the employment conditions required by DOL's H-2 regulations. For plaintiffs, the most important of these conditions were the ¾ work guarantee, an AEWR of $2.83 per hour, and the $5.00 per week transportation allowance.

Plaintiffs further contended that the individual growers, as well as PVFA as an entity, were their joint employers. The employment contract with PVFA, under plaintiffs' theory, was akin to a guarantor arrangement. The PVFA promised that if

---

**2.** PVFA actually filed two separate visa petitions. The first sought visas for 661 Mexican nationals to work from May 1 to November 30, 1977; the other sought visas for 148 Mexican nationals to work from May 1, 1977 to April 30, 1978. Both were granted.

plaintiffs made themselves available during the terms of the visas, grower members would provide them work, and that if the individual growers failed to honor the terms of the employment agreement, PVFA would be liable for the breach.

The plaintiffs' FLCRA claims dovetailed with, and to some extent overlapped, the contract claims. As we shall explain in more detail, *infra,* the FLCRA, before its repeal in 1982, regulated farm labor contractors—middlemen who recruit and hire migrant farmworkers—and required certain minimum standards for the employment of such workers. Some of these standards duplicated those required by DOL's H–2 regulations.

–4–

The district court refused plaintiffs' request to certify the 809 H–2 workers as a class under Fed.R.Civ.P. 23(b)(3), and the case went forward with 492 named plaintiffs, all Mexican nationals who worked for PVFA members during the 1977 harvest season. Because of the large numbers of parties suing, however, counsel for both sides took a number of steps to facilitate the court's decision in the case. First, the parties agreed to submit to the court cross motions for summary judgment so that the defendants' obligations under the FLCRA and the terms and conditions of employment that defendants were required to offer could be established. The parties stipulated to certain facts and supported their respective motions with documentary proof that had been developed in discovery.

After hearing arguments on the motions, the court made the following rulings. It held first that PVFA and its members were joint employers of the plaintiffs under a work agreement whose terms were in large part determined by DOL's H–2 regulations.

The court found that three provisions in the regulations—the AEWR of $2.83 per hour, the ¾ work guarantee, and the $5.00 per week transportation allowance—were not required conditions of employment, but held that in other respects the employment terms of the regulations should have been honored by the defendants. The court also found that PVFA qualified as a "farm labor contractor" under the FLCRA, thus triggering the obligations of that act.

As we will describe in more detail, *infra,* the court then ordered a separate trial on the issue of liability and damages. Following the trial and after considering motions for summary judgment by both parties, the court determined that PVFA had breached a number of its FLCRA and contractual obligations. These included PVFA's failure: 1) to register with the DOL as a farm labor contractor; 2) to give the workers written disclosures of the terms of their employment; 3) to post the terms of employment at the work site; 4) to keep wage records; 5) to provide wage receipts; and 6) to abide by the following conditions of employment: a) provision of insurance; b) maintenance of wage records; and c) provision of free tools.

The plaintiffs waived their rights to actual damages and instead sought liquidated damages under the FLCRA for both the breaches of the found terms of employment and of the various provisions of the FLCRA.[3] The court assessed damages of $15.00 for each of the violations of the FLCRA—e.g., PVFA's failure to register with the DOL as a farm labor contractor, its failure to provide plaintiffs with a written employment agreement, the growers' failure to maintain wage records—and damages of $300.00 for defendants' failure to abide by the terms of the work agree-

---

**3.** The FLCRA was amended in 1974 so as to provide a private right of action and a statutory damages provision. Under 7 U.S.C. § 2050a, workers employed by farm labor contractors or other agricultural employers who intentionally violate the Act's provisions may sue for actual damages or, in the absence of actual damages, statutory damages of up to $500.00 per violation.

The FLCRA requires, *inter alia,* that if a farm labor contractor acts as an employer he must abide by the terms of his work agreement, *see* 7 U.S.C. § 2044(b)(4), thus the plaintiffs asserted both their contract claims and FLCRA claims under the Act's statutory damages provision.

ment—e.g. payment at the minimum wage, the failure to provide free tools. The damages award for these latter violations was limited to piece rate workers.

The court then determined which individual plaintiffs were entitled to these damages on the basis of their responses to the defendants' interrogatories. If the worker had filed a response and was not one whose complaint was barred by limitations, he was awarded a total of $75.00 for the five found violations of the FLCRA. If the worker had been employed on a piece rate basis he was awarded an additional $300.00 for the breaches of the work agreement. The damages awarded totalled $53,550.00, and the defendants were held jointly and severally liable for that amount.

Plaintiffs appeal, urging that the district court erred in concluding that the work agreement did not include an AEWR of $2.83 per hour, a ¾ work guarantee, and a $5.00 per week transportation allowance. Plaintiffs also complain that the damages awarded were too low, that their suit should have been certified as a class action, and that if denial of certification was proper, the court erred in determining that certain groups of plaintiffs were barred by limitations. Defendants cross appeal, arguing that the district court erred in imposing any liability at all.

## II

■ The primary issue on appeal is whether the district court erred in determining the terms and conditions of employment the defendants were obligated to provide the plaintiffs. Plaintiffs contend that the court erred in failing to find that an AEWR of $2.83 per hour, a ¾ work guarantee, and a $5.00 per week transportation allowance were terms of their employment agreement.

As described above, the DOL regulations that govern the terms of employment that should be offered H–2 workers—20 C.F.R.

§§ 602.10a–602.10b (1977)—do not themselves create any private right of action, but plaintiffs argue that because such regulations have the force of law, these terms were part of their employment agreement with PVFA and its members. Defendants contend that because DOL's certification of H–2 visa petitions is only advisory to the INS—the INS has the final say in determining whether or not to issue H–2 visas—the only terms of employment applicable here were those PVFA and the growers actually *offered* to the plaintiffs. The district court took a middle ground, deciding that DOL's H–2 regulations were "not irrelevant," but declining to find that *all* of the regulations were part of the agreement.

The plaintiffs' position on appeal is that the discretion given to the INS to approve H–2 petitions without certification from the DOL means that the DOL regulations apply *unless* the INS waives such requirements. The plaintiffs find support in the INS regulation which requires that in the absence of certification from the DOL, the petitioning employer must "present ... evidence that the employment policies of the Department of Labor have been observed." 8 C.F.R. § 214.2(h)(3). The INS, which was for a time a party to this suit, concurred in plaintiffs' construction.[4] Defendants maintain their position that certification has nothing to do with the terms of employment so long as INS issues the H–2 visas without such certification.

The effect of the DOL regulations is not apparent from their face, nor have we any appellate authority to guide us. However, given the purpose of certification and the employment conditions set by DOL's H–2 regulations of ensuring that foreign workers are employed on terms that will not adversely affect the employment available to similarly situated U.S. workers, we conclude that the plaintiffs' proffered interpretation is the more plausible and we adopt it.

---

**4.** The INS stated in admissions filed with the district court:

It was in 1977, and continues to be, the policy of the INS that the Department of Labor has

primary responsibility for determining and enforcing the appropriate minimum labor standards for H–2 workers employed in this country pursuant to an approved visa petition.

We hold that the terms of employment set out in DOL's H–2 regulations, 20 C.F.R. §§ 602.10a–602.10b (1977), were the terms the defendants were required to offer unless those terms were waived by the INS when it approved defendants' visa petitions. We now examine the plaintiffs' contention that the three requirements rejected by the district court were in fact part of their work agreement.

–1–

■ The requirement that defendants pay an AEWR of $2.83 per hour was hotly disputed both below and on appeal. Although it is not disputed that DOL requested that PVFA offer an AEWR of $2.83 per hour, the defendants contend that because DOL did not publish an AEWR for agricultural employees in the State of Texas until 1978, the DOL could not require such wages to be paid. Plaintiffs respond that prior to 1968, DOL published an AEWR for all states, and that after 1976 DOL relied on the methodology published in 41 Fed. Reg. 25018 (June 22, 1976) for calculating such wages. Although the DOL continued publication of AEWRs for about a dozen states through 1977 and this list did not include Texas, plaintiffs explain that DOL policy was to require payment of an AEWR in all states and to publish AEWRs for only those states where significant numbers of H–2 workers were employed.

Defendants reply that the regulation granting DOL the authority to determine AEWRs for those states for which rates were not published, *see* 20 C.F.R. § 602.-10b(a)(3) (1969), was deleted in 1970. Defendants also point to DOL's statement in 20 C.F.R. § 655.207(a) (1978) that, "except as otherwise provided in this section, the adverse effect rates for all agricultural and logging employment shall be the prevailing wage rates in the area of intended employment," and the language used in the Federal Register notice in 1978 which proposed adding Texas to the list of states for which an AEWR was published: "the adverse effect wage rate for Texas *will be established and set* to prevent the employment of these aliens from having an adverse effect on the wages of U.S. workers who are similarly employed." 43 Fed.Reg. 22996 (May 30, 1978) (emphasis supplied).

In our view, all that can be determined from the history of DOL's AEWR regulations is that the validity or even the existence of non-published AEWRs is at best uncertain. Given the deletion of the regulation that gave DOL the authority to determine unpublished AEWRs and the express language in DOL's regulations that *were* published in 1978, however, we are persuaded, on balance, that there was no AEWR in effect for Texas in 1977. It is well-established that an agency is bound by its own regulations. *See United States v. Nixon,* 418 U.S. 683, 696, 94 S.Ct. 3090, 3101, 41 L.Ed.2d 1039 (1974). We hold that the district court correctly determined that the offered wage rate of $2.20 per hour, the minimum wage in 1977, was the rate that should have been paid under plaintiffs' employment agreement.

–2–

■ The district court refused to find that the ¾ work guarantee of 20 C.F.R. 602.10a(h) (1977), was part of plaintiffs' work agreement. The ¾ guarantee is a promise that agricultural workers offered employment under the H–2 program will be given work or wages for at least ¾ of the period for which they are to be employed. The DOL requires the guarantee as a condition of employment in order to assure that growers do not "artificially" inflate the labor pool by recruiting more workers than are needed. The district court explained that given the extraordinary circumstances surrounding the issuance of the plaintiffs' visas and the fact that the labor requirements of the growers varied considerably through the harvest season, it would be unduly harsh to have found the ¾ guarantee to be part of the work agreement.

Plaintiffs challenge this ruling on the ground that "harshness" is not an adequate reason to permit defendants to avoid the regulation. We agree. There is no "hardship" exception to DOL's labor standards for H–2 workers. *Florida Sugar*

*Cane League v. Usery*, 531 F.2d 299, 304 (5th Cir.1976), *quoting Elton Orchards, Inc. v. Brennan*, 508 F.2d 493, 500 (1st Cir.1974). Moreover, there is no indication that the INS excepted the ¾ work guarantee when it approved the visas, and INS's position in this litigation was that it has never excepted that requirement. As we stated above, we hold that in absence of an INS exception, DOL's H–2 regulations determined the minimum conditions of plaintiffs' employment. The harshness of the requirement ought to have been put before the INS.

–3–

■ The plaintiffs also complain that the district court should have found that the defendants were obligated to pay each worker a $5.00 per week transportation allowance. The pertinent DOL regulation, 20 C.F.R. § 602.10a(g) (1977), required employers petitioning for H–2 workers to offer "transportation from the workers' on-the-job-site living quarters to the place the work is to be performed ... without cost to the worker." Because none of these plaintiffs were "on-the-job-site" workers and instead commuted from their homes in Mexico, the district court found that the regulation by its very terms was inapplicable.

Plaintiffs argue on appeal that their right to the transportation allowance does not hinge on the terminology of DOL's regulation, explaining that PVFA *promised* in its visa petitions that it would pay a $5.00 transportation allowance to workers who accepted the visas. By offering this term of employment even where the DOL regulations did not require it, plaintiffs contend, the $5.00 allowance became part of the employment agreement.

We think plaintiffs' point is well-taken. The defendants have repeatedly argued that the terms of plaintiffs' employment were only those terms defendants chose to offer, and the record demonstrates that a transportation allowance was in fact offered by PVFA. Although the regulations set the minimum terms of employment, we do not believe they prohibited the defendants from offering additional benefits.

Having promised to pay each plaintiff a $5.00 per week transportation allowance, PVFA became contractually obligated to do so.

III

The next set of issues we must address are raised in PVFA's cross appeal. PVFA argues that the district court erroneously concluded that the Association acted as a farm labor contractor when it petitioned the INS for visas on behalf of its members and when its members recruited the plaintiffs to accept the visas. PVFA also argues that even if it was a farm labor contractor, its violations of the FLCRA and the work agreement were not "intentional" and thus cannot support an award of damages, and that most of the alleged violations were committed by individual growers rather than the Association. We address each contention in turn.

–1–

■ The FLCRA was enacted in 1963 to protect migrant and seasonal farmworkers from abuses of the farm labor contractor system. *See Almendarez v. Barrett-Fisher Co.*, 762 F.2d 1275, 1279 (5th Cir.1985); *Soliz v. Plunkett*, 615 F.2d 272, 276 (5th Cir.1980). *See generally* Note, *A Defense of the FLCRA*, 59 Texas L.Rev. 531 (1981). The Act regulated both those who qualified as farm labor contractors and those who employed such contractors. In brief, "[t]he Act guarantee[d] that farmworkers receive[d] notice of the terms and conditions of employment offers, and generally deter[red] employers from exposing farmworkers to hazardous conditions, breaching employment agreements, or denying farmworker employees the rights and benefits secured by other federal statutes." Note, *supra*, at 531.

PVFA argues that the Act cannot apply here because PVFA did not qualify as a farm labor contractor. There are several requirements under the statute. A farm labor contractor is one who: (1) recruits, solicits, hires, furnishes or transports, (2) for a fee, (3) migrant workers, (4) for agricultural employment. 7 U.S.C. § 2042(b).

Here the "fee" requirement is satisfied by the dues the grower members paid to the PVFA, and the last two requirements are concededly met. The PVFA denies, however, that in petitioning for the H–2 visas and offering those visas to the workers through its grower members that it "recruited," "solicited," "hired," or "furnished" workers to its members.

The district court found that three actions of the PVFA met this requirement of the statute. First, the articles of incorporation for the PVFA set out as its purpose to "contract for and obtain migrant labor for the use of its members"; second, the PVFA solicited workers through newspaper and radio ads in both Texas and Mexico pursuant to DOL certification procedures; and third, the PVFA petitioned INS for the H–2 clearance visas.

The PVFA responds that its articles of incorporation are irrelevant because they were written after these plaintiffs were employed, that plaintiffs cannot rely on the radio and newspaper ads because none of them were actually recruited through those ads, and that the H–2 visa petitions were acts solely between PVFA and the INS. PVFA adds that most if not all of the 809 aliens for whom visas were sought had worked or were already working for PVFA members. Thus the recruitment process for their employment under H–2 involved only the efforts of the member growers to determine which of their current or past employees desired to have PVFA petition for a visa for them. Finally, PVFA argues that a non-profit association such as itself simply is not the sort of middleman/recruiter that the FLCRA was intended to cover.

We are not persuaded. The articles of incorporation are relevant evidence of the purpose for which PVFA was formed in 1977, and the advertisements and visa petitions were indisputably direct efforts by the PVFA to create a pool of temporarily legalized labor which its members could share. It was PVFA, not the individual growers, who determined what terms of employment would be offered in the H–2

visa petitions. It was PVFA, not the individual growers, that was listed as the plaintiffs' employer on the INS visa petitions. That the final step in the recruiting process was carried out by PVFA grower members who approached those workers already on their farms does not remove PVFA's "middleman" status, for the efforts of the individual growers were made *on behalf* of the PVFA and its members. In fact, several of the growers did no recruiting and relied on the efforts of other members to recruit enough Mexican workers to meet the needs of all of the growers in the Valley. Indeed, although the majority of the plaintiffs were employed by a single grower, over the course of the harvest many worked for more than one PVFA member because the growers shared the workers among themselves as their employment needs varied.

In short, the record demonstrates that the PVFA, as an entity and through its members, acted very much as a middleman between the member growers and the plaintiffs, and succeeded in creating a legalized labor pool for the growers' common benefit. These activities fit comfortably within those Congress intended to regulate under the FLCRA. *See Almendarez,* 762 F.2d at 1281 (holding vegetable packing shed operators to be contractors under the FLCRA where the operators "[could] identify no functional distinction between their activities ... and those of the middlemen recognized as farm labor contractors [under the Act].")

Nor is our analysis changed because of PVFA's status as an unincorporated association at the time these events took place. Similar associations of growers have previously been found to be farm labor contractors under the Act, *see Marshall v. Coastal Growers Ass'n,* 598 F.2d 521 (9th Cir.1979), and commentators have urged that coverage of nonprofit associations of farmers was intended by the drafters of the FLCRA. *See* Note, *supra,* 59 Texas L.Rev. at 553–54. The defendant growers received the benefits of combining in the Association; we will not now ignore its role.

–2–

■ Nor do we agree with defendants that the district court erred in holding the PVFA and its member growers liable for damages under the FLCRA for their "intentional" violation of the Act's provisions. We set out the test for "intent" under the FLCRA in *Castillo v. Givens*, 704 F.2d 181 (5th Cir.), *cert. denied*, —— U.S. ——, 104 S.Ct. 160, 78 L.Ed.2d 147 (1983). Intentional means "conscious or deliberate"; *id.* at 197; there is no requirement of a specific intent to violate the FLCRA; rather, "the standard for an intentional violation [is] … 'the common civil standard which holds a person liable for the natural consequences of his or her acts.' " *Id.* at 197–98, quoting *DeLeon v. Ramirez*, 465 F.Supp. 698, 705 (S.D.N.Y.1979). The district court applied the *Castillo* test in determining that the defendant's violations were intentional.

Defendants argue that the Court's recent opinion in *Trans World Airlines, Inc. v. Thurston*, —— U.S. ——, 105 S.Ct. 613, 83 L.Ed.2d 523 (1985), which overturned our construction of "willful" under the FSLA in *Coleman v. Jiffy June Farms, Inc.*, 458 F.2d 1139, 1142 (5th Cir.1971), *cert. denied*, 409 U.S. 948, 93 S.Ct. 292, 34 L.Ed.2d 219 (1972), suggests that our interpretation in *Castillo* was too generous. We disagree. The standard for showing willful violations of the ADEA so as to trigger its liquidated damages provisions, which Congress intended to be punitive in nature, *see Thurston*, 105 S.Ct. at 624, should not be applied here. As we explained in *Castillo*, the courts have construed the "intent" requirement necessary to trigger the damages provisions of the FLCRA so as to further the Act's *remedial* purposes. 704 F.2d at

198. *Accord Almendarez*, 762 F.2d at 1281. Our adoption of the general civil standard for intent furthers that purpose, and we will not depart from it here.[5]

Defendants also suggest that the district court failed to make the factual findings necessary to support a conclusion that their violations of the FLCRA were intentional, because the court did not expressly find their acts to be "conscious or deliberate." Moreover, defendants argue, the record could not have supported such a finding. We are not persuaded. We think the district court's conclusion that defendants' acts met the intent standard set out in *Castillo* is both implicit and explicit in its memorandum opinion on liability and damages. For example, the court stated that it found that defendants carried out an "intentional pattern and practice" of failing to pay piece rate workers at the minimum wage and that plaintiffs suffered from "defendants' intentional violations of the FLCRA…." We refuse to read the district court's opinion so hypertechnically as defendants. The court's conclusion that these violations were intentional is adequately supported by the record and is not clearly erroneous.

–3–

■ Lastly, defendants contend that PVFA cannot be held responsible for breaches of the FLCRA and work agreement to the extent that such violations occurred in day to day employment activity —e.g. the failure to pay adequate wages, provide wage receipts, or maintain wage records. These violations, defendants argue, were committed by the individual growers who employed the workers on a day to day basis and not by the PVFA,

---

5. Defendants also argue that their violations were not intentional because they were unaware of the FLCRA and the necessity of complying with it. The argument is without merit. Were we to require that a defendant have knowledge that he was violating the FLCRA before labelling his actions "intentional," we would change the intent standard to one of "specific intent," a standard we rejected in *Castillo*. The focus under the standard we adopted there is on the deliberateness of the conduct involved, not the defendant's knowledge of the Act.

In any event, the record contains sufficient evidence to support a conclusion that the defendants were aware of the FLCRA. The president of PVFA, Bill Bishop, admitted that he was aware of the Act in 1977 and that he had previously hired workers through farm labor contractors. In addition, the Texas Employment Commission called PVFA officials' attention to the Act in 1977 because the clearance orders PVFA filed with the Commission stated, as they were required to, that PVFA was in compliance with the FLCRA.

thus the PVFA cannot be held responsible for them.

We disagree because, in our view, the district court correctly found PVFA to be the joint employer of the plaintiffs. The PVFA cannot seriously challenge this finding since it repeatedly represented itself to be the plaintiffs' employer when applying to the INS for the H–2 visas. Indeed "employer" status was necessary to obtain the visas since they could be granted only on the petition of the "importing employer." In addition, as we explained in part III, 1 of this opinion, *supra,* the PVFA, acting for the joint benefit of its members, determined the terms and conditions of employment that the growers would offer and recruited workers to accept the visas. Its members then freely shared the workers among themselves. We agree with the district court that these representations and actions render the PVFA liable for the FLCRA violations and breaches of the employment agreement as a joint employer of the plaintiffs.[6]

### IV

Both plaintiffs and defendants attack the district court's award of damages. Plaintiffs contend that the court abused its discretion in determining liquidated damages for violations of the provisions of the FLCRA and that the liquidated damages award for defendants' breaches of the work agreement was inadequate and improperly limited to piece rate workers. Defendants do not challenge the damage awards relating to specific provisions of the FLCRA, but contend that plaintiffs did not properly prove up their damages for defendants' alleged breaches of the work agreement.

---

**6.** The defendants also argue that they cannot be held liable under the FLCRA because Congress extinguished plaintiffs' causes of action when it enacted the MSAWPA. *See infra* section IV, 1 and n. 7. This argument is without merit. Section 109 of Title 1 of the United States Code provides:

The repeal of any statute shall not have the effect to release or extinguish any penalty,

–1–

The FLCRA provided in pertinent part that:

If the court finds that the respondent has intentionally violated any provision of this chapter or any regulation prescribed hereunder, it may award damages up to and including an amount equal to the amount of actual damages, or $500 for each violation, or other equitable relief.

7 U.S.C. § 2050a(b) (repealed 1982). As we explained in *Beliz v. McLeod & Sons Packing Co.,* 765 F.2d 1317 (5th Cir.1985), the purpose of this civil remedy is both compensatory and punitive. It is designed to "correct the exploitive practices that have historically plagued the migrant farm labor market." *Id.* at 1332.

Although the statutory goals are readily apparent, our review of these awards is limited because the amounts set are a matter for the discretion of the district court. We have held that, when liquidated damages are sought under this provision, the district court has discretion to award an amount *up to* $500. *Castillo v. Givens,* 704 F.2d at 197 n. 37. The court is not *required* to award $500. *Id. See also Alvarez v. Joan of Arc, Inc.,* 658 F.2d 1217, 1224 (7th Cir.1981) (rejecting argument that where liquidated damages, rather than actual damages are sought, court must award $500 for violation). As we noted in *Beliz,* "[t]he courts have articulated no systematic criteria to guide the exercise of a trial court's discretion in fixing the amount of damages, but this is an almost inevitable result of imparting discretion.... Rigid rules would deny the district court [that] discretion...." 765 F.2d at 1333.

The district court awarded damages of $15.00 for each of the following violations

forfeiture, or liability incurred under such statute, unless the repealing act shall so expressly provide, and such statute shall be treated as still remaining in force for the purpose of sustaining any proper action or prosecution for the enforcement of such penalty, forfeiture, or liability....

There is no such expression of intent in the MSAWPA.

of the FLCRA: 1) PVFA's failure to register as a farm labor contractor; 2) PVFA's failure to provide a written work contract to each plaintiff; 3) the growers' failure to post the terms and conditions of employment at the work site; 4) the growers' failure to maintain wage records; and 5) the growers' failure to provide plaintiffs with wage receipts. The court was careful to outline the considerations that guided it in determining these amounts: Congress' intent in the FLCRA to "cur[e] abuses in the agricultural market"; the substantive impact on plaintiffs caused by defendants' violations; the intentional aspect of defendants' violations; and the impact on the general public that would result from the court's assessment of liquidated damages against the defendants.

The plaintiffs challenge these awards as too low to vindicate their private right of action under the FLCRA. Plaintiffs also argue that the district court improperly labelled the violations as "technical," that the court failed to consider the willfulness of defendants' violations, and that the court erroneously took into consideration the fact that Congress eliminated the plaintiffs' FLCRA claims when it replaced that Act with the Migrant & Seasonal Agricultural Worker Protection Act, 29 U.S.C. §§ 1801–1872.[7]

Whether or not we might have been inclined to award greater damages than did the district court for these FLCRA violations, the district court supported its decision with factors that could properly be considered by it, and we cannot find an abuse of discretion. Although the damages assessed for each violation appear thin when considered separately, we cannot ignore their weight when combined in an award that included damages for other violations; nor can we ignore the fact that these damages were awarded to over 150 persons. The district court was properly concerned with the possibility that an unreasonably excessive damage award might

not only punish defendant growers, but might also ultimately harm plaintiffs, individuals whose welfare was linked to that of the Valley's farming industry as surely as was that of the defendants. As we stated in *Beliz*, "the total number of plaintiffs involved, the total number of violations, and the total amount that will be exacted from the delinquent defendant" are all relevant considerations. *Beliz*, 765 F.2d at 1333. Such concerns are part and parcel of the discretion Congress afforded the district courts in assessing FLCRA damages.

Plaintiffs' remaining challenges to the award are also without merit. First, we think the record supports the court's finding that the defendants' violations of the Act were intentional, but the evidence certainly did not compel the court to conclude that the violations were willful. Nor did the court err in considering the MSAWPA or in labelling defendants' violations "technical." The court explained that it considered the MSAWPA mindful that the savings statute of 1 U.S.C. § 109 mandated that "the repeal of the FLCRA should have *no impact* on the bringing of this action," and that it considered the MSAWPA only "to fully determine the actual legislative intent and purpose to be served in this action" (emphasis added). Finally, the court "stress[ed] that it d[id] not wish to minimize defendants' actions by labelling some of those actions as Technical Violations...." The court explained that it had done so only "in order to set forth th[e] complex and convoluted set of facts in a reasonably comprehensible fashion ... [and] with the hope that no person [would] employ semantic sport to thwart the clear intent of th[e] Court." We refuse to thwart that intent on appeal, and note that, in any event, consideration of the substantive or technical nature of the violations is entirely proper. *See Beliz*, 765 F.2d at 1333 & n. 72. We affirm the district court's exercise of its discretion in award-

---

7. 29 U.S.C. § 1802(6), (8)(B)(ii), (10)(B)(iii) excludes "any temporary nonimmigrant alien who is authorized to work in agricultural employ-

ment under [H–2] and § 1184 of Title 8" from coverage under the MASWPA.

ing $15.00 in damages for each of defendants' violations of the FLCRA.[8]

–2–

■■■ Both parties attack the court's award of $300.00 for defendants' alleged breaches of the work agreement. Before addressing these contentions, we must explain the somewhat unique procedure the district court employed to assess liability and damages once it had determined what defendants' obligations were under the FLCRA and under the work agreement.

Although the parties did not dispute that the PVFA and its grower members had violated the various provisions of the FLCRA described above, they did dispute the extent to which the defendants had violated the terms of their work agreement with the plaintiffs. Moreover, it was conceded by plaintiffs that liability and damages for these breaches, although quite similar, would vary from individual to individual. Because such liability and damages would vary, it appeared that each of the hundreds of Mexican plaintiffs, most of whom could not speak English, would have to testify about his conditions of employment to establish his right to recovery and the damages he had sustained.

All parties were anxious to proceed with the damages phase of the case, yet none wished to pursue this course. Accordingly, the plaintiffs proposed the following approach. Plaintiffs were willing, they explained, to waive their rights to actual damages for breaches of the work agreement and would pursue instead liquidated damages for those violations under the

FLCRA.[9] The court could then conduct a brief damages trial in which it would hear testimony from a number of "representative plaintiffs," testimony sufficient to enable the court to determine conditions of employment that would be considered to have been common to all plaintiffs. Based on that testimony, the court could also decide on a sum of liquidated damages that would be appropriate in light of the found violations. In short, plaintiffs suggested that the parties could avoid the difficulties of specific proof because the court need not determine actual damages for each plaintiff nor determine the particular conditions of employment that each faced. The court could instead extrapolate from the proof offered by the representative plaintiffs at the damages trial and award the damages so determined to the remaining plaintiffs on the basis of evidence developed in discovery—primarily, plaintiffs' answers to defendants' interrogatories.[10]

The court adopted and followed plaintiffs' suggested procedure in determining damages for breaches of the work agreement. After three days of testimony and considering motions for summary judgment by both parties which the court described as supported by "voluminous proof," the court found that defendants breached their employment agreement as to those plaintiffs who were employed on a piece rate basis in three ways: 1) failing to pay plaintiffs a minimum wage; 2) failing to provide plaintiffs free tools; and 3) making unauthorized deductions from plaintiffs' wages. The court then decided that the sum of $300.00 was proper liquidated

8. Plaintiffs also complain that the district court erred in failing to hold defendants liable for making false and misleading statements to plaintiffs in violation of 7 U.S.C. § 2044(b)(2). We find no error in this omission because we are not persuaded that the record could support a finding that defendants made such statements. In any event, any damages awarded for breaches of the terms of the work agreement would suffice to compensate plaintiffs for this asserted violation.

9. Because the court had denied plaintiffs' right to the AEWR, the transportation allowance, and the ¾ work guarantee, the core of the plaintiffs' contractual claims had been lost; thus this

"waiver" was less significant than it would otherwise have been.

10. Under plaintiffs' proposal, both parties would submit motions for summary judgment following the damages trial. These motions were to provide a means not only for plaintiffs to show, based on sworn evidence (the sworn answers to interrogatories) that those not testifying at the trial were similarly situated to those who testified, but also for defendants to point out, with the same sort of evidence or with affidavits, any plaintiff who was not similarly situated to the representative plaintiffs.

damages for those violations and awarded that amount to each plaintiff whose answers to defendants' interrogatories showed him to be a piece rate worker.[11]

Both parties attack the award. Plaintiffs complain that the sum of $300.00 is too low, that it does not compensate them for a number of violations proved at the damages trial, and that the award was improperly limited to piece rate workers. Defendants attack the damage award because nearly all the plaintiffs who received it recovered on the basis of their answers to defendants' interrogatories. Defendants argue that they never consented to try damages on this basis and that the interrogatories are hearsay which cannot support an award of damages.

Although we would not otherwise question the sum of $300.00 as too low, we agree with plaintiffs that the district court inexplicably omitted from its liability findings and damage award a number of asserted violations [12] and that the court did not explain its basis for limiting that award to piece rate workers. We do not resolve these issues but rather vacate the damages award so that the district court can address them on remand. The court will have to reassess its award, in any event, to determine the changes to be made in the award, if any, in light of our conclusion that the ¾ work guarantee and $5.00 transportation allowance were part of the work agreement, and we think these other issues can best be addressed at that time.[13]

More fundamentally, we agree with the defendants that the award cannot stand because there was no consent to the procedures employed to assess liability and damages. We recognize that the district court faced a difficult problem, given the number of parties involved and the complexity of the case, and that the procedure followed was a useful means of resolving those difficulties fairly and expeditiously. The procedure founders, however, for lack of evidence in the record that the defendants either understood or agreed to it. Indeed, we confess that we are not fully confident that our understanding of the procedures employed is what the plaintiffs intended, although we believe our interpretation accurately reflects what the district court intended to accomplish. These questions are best resolved on remand where the procedures to be used to determine liability and damages for the breaches of the work agreement can be formalized in a pre-trial order consented to by all of the parties.

V

The next set of issues pertain to the district court's refusal to certify as a class under Fed.R.Civ.P. 23(b)(3) the 809 workers for whom the defendants obtained visas. In the event that we affirm the court's refusal to certify the class, plaintiffs ask us to reverse the court's determination that a number of plaintiffs are barred by limitations. Before addressing these issues, we should explain the convoluted procedural history behind this case.

*Salazar v. PVFA* is, in fact, four separate actions by H–2 workers in the Western District of Texas that were consolidated prior to trial: *Lara v. PVFA* (six plaintiffs); *Salazar v. PVFA* (251 plaintiffs); *Primero v. PVFA* (251 plaintiffs—the same plaintiffs as in *Salazar*); and *Zuniga v. PVFA* (235 plaintiffs). *Lara*, the first action brought, was filed as a class action in the El Paso division in April 1979 on behalf of all 809 Mexican nationals who

---

**11.** Only seventeen of the 159 plaintiffs whose claims were not barred by limitations were not employed on a piece rate basis; thus the overwhelming majority of the plaintiffs who recovered were awarded $375.00.

**12.** These include primarily plaintiffs' claim that the defendants breached their obligation to provide insurance coverage for the H–2 workers.

**13.** Defendants argue that because at the liability/damages trial plaintiffs sought liquidated damages under the FLCRA rather than actual damages, plaintiffs have waived their rights to any actual damages, including damages for the ¾ work guarantee and the $5.00 transportation allowance. We leave this matter for the district court to resolve in the first instance on remand.

worked under the H–2 program in 1977. The El Paso court denied class certification on March 30, 1981. Plaintiffs then filed the *Salazar* and *Primero* actions in the Pecos division, each suit naming the same 251 plaintiffs, all of whom were members of the putative class in *Lara.* The only difference in *Salazar* and *Primero* were the claims made; one alleged breaches of the FLCRA, and the other alleged causes of action in contract. Plaintiffs attempted to bring both suits as class actions, suggesting the same class denied in *Lara,* but the district court denied class certification on February 2, 1982. Two days later, 235 additional members of the putative class moved to intervene in the *Salazar/Primero* cases, but the court denied intervention. These 235 individuals then filed a separate complaint, the *Zuniga* action, in the Pecos division, alleging the same causes of action brought in *Salazar/Primero.* The *Lara* case was transferred from the El Paso division to the Pecos division, and the court consolidated all four cases under the *Salazar* heading.

–1–

Plaintiffs complain that the Pecos court erred in refusing to certify the class. The court cited as its reasons the same reasons given by the El Paso court that denied certification in *Lara:* (1) common questions of law and fact did not predominate because the plaintiffs' claims varied with the employment conditions each faced; and (2) a class action was not necessarily the superior method for handling the controversy. Plaintiffs complain that common issues did predominate and that the court ultimately handled *Salazar* as if it were a class action, therefore demonstrating that its initial refusal to certify the class was an abuse of discretion.

We disagree. The district court has broad discretion in determining whether or not to certify a class under Rule 23. *See, e.g., Califano v. Yamasaki,* 442 U.S. 682, 99 S.Ct. 2545, 61 L.Ed.2d 176 (1979); *Danner v. United States Civil Service Comm'n,* 635 F.2d 427, 433 (5th Cir.1981). As explained in *Richardson v. Byrd,* 709 F.2d 1016, 1019 (5th Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 527, 78 L.Ed.2d 710 (1983):

> Under Rule 23 the district court is charged with the duty of monitoring its class decisions in light of the evidentiary development of the case. The district judge must define, redefine, subclass, and decertify as appropriate in response to the progression of the case from assertion to facts. We recognize that these complex cases cannot be run from the tower of the appellate court given its distinct institutional role and that it has before it printed words rather than people. It follows that class certification decisions must be protected by a level of review that accords substantial discretion. At the same time we keep in mind that while Rule 23 is not self defining and employs sometimes internally overlapping indexes, it is, nonetheless, a rule with limits both internal to the rule and without.

It is in this spirit, one that accords the trial court decision the substantial discretion which is its due, that we review the court's refusal to certify the class in this case.

We find no abuse of discretion here. Although the court subsequently treated the case almost as if it were a class action, it did so only upon the asserted agreement of the parties when faced with liability and damages issues which, although similar, were concededly individual. That the court agreed to proceed on this basis does not suggest that its initial determination that common issues in the suit did not predominate was incorrect, and certainly does not make that earlier decision an abuse of discretion.

Although we affirm the district court's refusal to certify the class, we in no way restrict the court's discretion to change that decision on remand. It is well-settled that decisions on class certification are always interlocutory. *See, e.g., Elster v. Alexander,* 608 F.2d 196, 197 (5th Cir. 1979) ("The district court has a continuing power under Fed.R.Civ.P. 23(c)(1). The certification decision 'is not irreversible and

may be altered or amended at a later date,'" *quoting* 7A C. Wright & A. Miller, *Federal Practice and Procedure* § 1785 at 137 (1971)).

–2–

■ The district court refused to award damages to any of the *Zuniga* plaintiffs, reasoning that all of those individuals' claims were barred by limitations. The district court noted that Congress did not set any statute of limitations for damage actions under the FLCRA, hence it applied the Texas statute of limitations for analogous types of actions. *See Chevron Oil Co. v. Huson*, 404 U.S. 97, 104, 92 S.Ct. 349, 354, 30 L.Ed.2d 296 (1971) ("[W]hen a federal statute creates a wholly federal right but specifies no particular statute of limitations to govern actions under the right, the general rule is to apply the state statute of limitations for analogous types of actions.") The court correctly determined the most analogous Texas statute to be Tex.Rev.Civ.Stat. art. 5526 § 4, which at the times pertinent here, imposed a limitations period of two years on "actions for debts ... not evidenced by a contract in writing." The court then applied *Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345, 103 S.Ct. 2392, 76 L.Ed.2d 628 (1983), which holds that the statute of limitations for putative class members is tolled pending a decision on class certification, *see id.* 103 S.Ct. at 2397, and ruled that limitations were tolled for all 809 workers during the time that elapsed between the date *Lara* was filed and the date the El Paso court denied class certification in *Lara*. According to the court's calculations, the claims of all of the plaintiffs in the *Zuniga* group were time-barred even considering the time added to limitations by tolling.

Plaintiffs argue on appeal that under *Crown* limitations tolled as well during the ten months when class certification in *Salazar/Primero* was pending, thus making the limitations period long enough to include all of the *Zuniga* plaintiffs. *Crown*'s tolling principle applies, plaintiffs argue, not only for the first class certifica-

tion petition filed but also for any subsequent petitions involving the same class. We are not persuaded. Plaintiffs have no authority for their contention that putative class members may piggyback one class action onto another and thus toll the statute of limitations indefinitely, nor have we found any. To the contrary, it has repeatedly been noted that "the tolling rule [in class actions] is a generous one, inviting abuse," *see id.* at 2398 (Powell, J. concurring); *American Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 561, 94 S.Ct. 756, 770, 38 L.Ed.2d 713 (1974) (Blackmun, J., concurring), and to construe the rule as plaintiffs would have us presents just such dangers. Given the particular facts here, we decline the invitation.

Plaintiffs correctly point out, however, that the district court made certain miscalculations in determining when limitations expired. The court stated that class certification was denied in *Lara* on March 21, 1981 and that the *Zuniga* complaint was filed on April 2, 1982, when in fact the correct dates are March 30, 1981 and March 2, 1982, respectively. These corrections indicate that the district court's calculations are off by 39 days. Since the court concluded that limitations expired for the *Zuniga* plaintiffs on May 9, 1978, and the last workday for any of the plaintiffs was April 30, 1978, this correction may alter its decision on which *Zuniga* claimants are time-barred. Accordingly, we vacate the court's decision on limitations so that it may calculate anew the limitations deadline applicable for the *Zuniga* claimants.

VI

■ Finally, plaintiffs complain on appeal that the district court's judgment contained errors of law as well as clerical errors with respect to the damages awards. The primary dispute concerns the district court's refusal to award damages to eighty-nine plaintiffs who were not named in the *Lara, Salazar*, or *Primero* complaints but who moved for judgment after the liability/damages trial based on their answers to defendants' interrogatories.

**1352**

The district court permitted recovery by only those plaintiffs who were both named in one of the four complaints and who had also filed answers to the interrogatories. Plaintiffs contend that the district court should have allowed their counsel to add those individuals to the pleadings under Fed.R.Civ.P. 15(b) on the ground that the case had been tried by consent with respect to them.

We are not persuaded. Rule 15(b) permits amendments where issues not raised by the pleadings are in fact tried by the express or implied consent of the parties. *See, e.g., American Standard Credit v. National Cement Co.*, 643 F.2d 248, 257 n. 4 (5th Cir.1981). *See generally* 6 C. Wright & A. Miller, Federal Practice and Procedure § 1493 (1971). Although the rule is a generous one which effects the desirable policy of bringing pleadings in line with issues that actually were developed at trial, we do not think it should be construed here to encompass individuals who were not named plaintiffs in any of the four consolidated cases. The liability trial conducted with representative plaintiffs and defendants was not sufficient to apprise defendants that they were litigating claims of individuals other than those named in the four complaints. The court was therefore within its discretion in refusing plaintiffs' post-judgment offer to amend their pleadings.

**14.** These individuals are:

| | |
|---|---|
| Ansires Grado | Isidro Hernandez |
| Francisco Ontiveros Lara | Isael Tercero |
| Baudilio Rivas Gardea | Evangelina Tavarez |
| Patricio Herrera Carreon | Rigoberto Diaz Franco |

**15.** These individuals answered interrogatories under the following names:

| | |
|---|---|
| Luis Anaya Terrazas | Gilberto Tercero Galindo |
| Jesus Avila Lara | Huberto Saenz Gonzalez |
| Librado Gallegos Urias | Amado Salazar Hurtado |
| Amadina Guzman Astorga | Carmen Aguirre Acosta |
| Dionisio Licon Galindo | Miguel Hernandez Lujan |
| Joaquin Ortiz Olivas | Jesus Manuel Contreras |
| Benjamin Peregrino Martinez | Leonardo Ovalle Valles |
| Eleazar Peregrino Martinez | |

**16.** These individuals are listed in the *Salazar* complaint as:
Maximo Cabrera Lopez
Jorge Hinojosa C.

It appears, however, that defendants conceded below that at least nine of the 89 individuals were named in one of the four complaints.[14] We vacate the district court's judgment insofar as it denied recovery to those individuals and remand so that the court can determine the damages to which those plaintiffs are entitled.

It also appears that the names of fifteen other individuals may have appeared in one of the four complaints in slightly altered spellings. For example, Amado Salazar Hurtado filed interrogatory answers and a similar name, Alfredo Salazar Hurtado, appears in the *Salazar* complaint. The names do not match precisely, but given that the names in the captions and interrogatories were in most cases either transcribed from the signatures of functionally illiterate clients or transcribed phonetically in the process of individual interviews, we think some leeway is appropriate. At the least, plaintiffs should be permitted to offer additional evidence on these individuals.[15] We vacate the judgment as to them so that the district court can consider this issue if the plaintiffs can in fact come forward with such evidence.

Plaintiffs also argue that the district court erroneously listed as *Zuniga* plaintiffs fourteen individuals[16] whose names are similar to names in the captions in both *Salazar* and *Zuniga*, and that the court erroneously listed three workers[17] as non-

Manuel Guzman
Cruz Hinojos de Leon
Jose Mercedes Rivera
Guadalupe Sanchez
Teodoso Vasquez Mata
Joaquin Otilio Villalobos H.
Antonio Salazar
Antonio Olivas Ramirez
Ramon Aguirre Hernandez
Bertha Rodriguez Romero
Matilda Olivas Rodriguez
Marcelino Olivas Rodriguez, one of the 6 original *Lara* plaintiffs, should also be included in this group.

**17.** These individuals are:
Matias Hinojos Rey
Severiano Hinojos Quinonez
Cecilio Soto Perez

piece rate workers whose interrogatories showed them to be piece rate workers. These complaints appear to have merit. We vacate the district court's judgment as to these plaintiffs as well so that the district court can resolve these disputes in the first instance.

Finally, plaintiffs point out that the district court inadvertently failed to include in its judgment an award of $600.00 for attorney's fees. This omission was error and should be cured on remand.

## VII

To summarize, we affirm the district court's determination that the AEWR of $2.83 per hour was not one of the terms of plaintiffs' employment agreement but reverse its determination that the ¾ work guarantee and a $5.00 weekly transportation allowance were not part of that agreement. We affirm the district court's holding that PVFA was a farm labor contractor, that PVFA was a joint employer of plaintiffs, and that PVFA and the growers intentionally violated the FLCRA. We also affirm the liquidated damages awarded by the district court for defendants' breaches of the FLCRA. Because we have concluded that additional terms were part of the work agreement, however, we vacate the award of damages for defendants' alleged breaches of the agreement and remand so that the district court can award damages for those terms and so that it can consider the parties' other complaints about the award.[18] We affirm the court's denial of class certification and its decision on limitations, but order a recalculation of limitations for the *Zuniga* plaintiffs. Finally, we vacate the judgment as to the plaintiffs listed in notes 14–17 so that the district court can correct possible clerical and other errors in the judgment.

AFFIRMED IN PART, REVERSED IN PART, VACATED IN PART, AND REMANDED.

---

**18.** The district court should first address the defendants' argument that plaintiffs have waived their rights to actual damages. If there has been such a waiver, the court may nevertheless find it appropriate to vacate its liquidated damages award for the violations of the work agreement and reassess liability and damages in light of these additional terms.