Jesus BUENO; Jose Castro; Juana Castro; Evangelina Castro; Nieves Castro and Lucila Castro; minors, By and Through their next friend and parents Jose and Juana Castro; Linda Cerna; Andres Cerna; Frances Daughtry; Ernesto Cordova; Martha Cordova; Juanita Cordova; and Olga Cordova, Ernesto Cordova, Eulalio Cordova, and Robert Cordova, minors, By and Through their next friend and parents Ernesto and Martha Cordova; Eli Gonzalez, Jr.; Jesusita Gonzalez; Frank Martinez; Consuelo Salinas; Ronaldo Belmarez and Norma Belmarez, minors, By and Through their next friend and parent Consuelo Salinas; Rosario Moreno; Rafael Moreno; Raul Jasso; Aracelia Jasso; Ermelando Jasso; Josefina Jasso; Teodoro Jasso; Maria Luisa Jasso; Silvia Jasso; Dora Alicia Jasso; Teodoro Jasso, Jr.; Olga Lydia Jasso, minor, By and Through her next friend and parent Teodoro Jasso; Hermelinda Jasso; Reyna Jasso de Herrera; and Santos Herrera, Plaintiffs,

v.

Richard MATTNER and Darlene Mattner, d/b/a Mattner Farms, Defendants.

No. K84–63.

United States District Court, W.D. Michigan, S.D.

March 27, 1986.

Gary Gershon, Richard Kessler, Michigan Migrant Legal Assistance Project, Grand Rapids, Mich., for plaintiffs.

Richard Van Orden, Grand Rapids, Mich., for defendants.

## OPINION

ENSLEN, District Judge.

This action was filed on February 24, 1984, by a group of thirty-seven (37) migrant farm workers, consisting of twenty-eight (28) adults and nine (9) minors, claiming violations of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201–19, and the Migrant and Seasonal Agricultural Worker Protection Act ("MSAWPA" or the "Act"),

29 U.S.C. §§ 1801–72. The defendants are a husband and wife couple doing business as Mattner Farms, a farming operation located in Eau Claire, Berrien County, Michigan, that they jointly own and operate. The Court tried the case on October 7th, 8th, 9th, 15th, 16th, 23rd, 24th, and 25th. It heard testimony from 21 witnesses and accepted forty-eight (48) exhibits into evidence. The parties completed their post-trial briefing on December 4, 1985. In accordance with Federal Rule of Civil Procedure 52(a), the following opinion constitutes the Court's findings of fact and conclusions of law in this matter.

### Introduction

The parties stipulated to many essential facts. Defendants admit they are covered by the FLSA and that they accordingly were obligated to pay plaintiffs the prevailing minimum wage of $3.35 per hour in 1983. Defendants conduct a multi-crop farming operation and raise, among other crops, strawberries and pickles. They employed migrant laborers—including nearly all of the plaintiffs—in 1983 to assist them in cultivating and harvesting their crops. They paid the migrant workers, including plaintiffs, the following piece rate wages during the strawberry and pickle harvests: $1.60 per flat of capped strawberries (with the stem on); $1.85 per flat of uncapped strawberries (with the stem taken off); and $.90 per pail of pickles. The 1983 strawberry harvest commenced on June 16, 1983, and ended on July 6, 1983. The pickle harvest commenced on July 20, 1983.

Defendants provided rent-free housing for their migrant workers, including nearly all of the plaintiffs, in 1983. They admit

they are agricultural employers as that term is defined in the MSAWPA. 29 U.S.C. § 1802(2). They also admit with respect to that Act that they did not fulfill the following requirements: (1) provide in writing the information specified by 29 U.S.C. § 1821(a)(1)–(4); (2) post the poster required by 29 U.S.C. § 1821(b); or (3) provide the itemized written statement specified in 29 U.S.C. § 1821(d)(2). Plaintiffs for their part admit that the eight minor plaintiffs do not have a cause of action under the FLSA.[1]

The legal and factual issues this case presents arose out of the 1983 strawberry and pickle harvest on defendants' farm. Specifically, plaintiffs allege the following: 1) that defendants failed to comply with the MSAWPA, in part by failing to provide them a) with information concerning the terms and conditions of their employment and housing at the commencement of their employment, and b) with the wage records required by the Act; 2) that defendants did not pay them the minimum wage during the strawberry harvest; and 3) that defendants unlawfully discharged some of the plaintiffs in retaliation for having filed minimum wage complaints. The Court will first discuss plaintiff's FLSA claims, including their claim of retaliatory treatment. I then will discuss their MSAWPA claims.

### Plaintiffs' Minimum Wage Claims

The FLSA required defendants to have paid plaintiffs a minimum wage of $3.35 per hour during the 1983 strawberry harvest. Thus, although defendants paid plaintiffs on a piece rate basis, they had to ensure that plaintiffs' piece rate wage eq-

---

**1.** The parties stipulated that there were twenty-seven adult and ten minor plaintiffs. The Court, however, finds that the following twenty-eight persons have presented minimum wage claims: Jesus Bueno, Jose Castro, Juana Castro, Evangelina Castro, Linda Cerna, Andres Cerna, Frances Daughtry, Ernesto Cordova, Martha Cordova, Juanita Cordova, Eli Gonzalez, Jesusita Gonzalez, Consuelo Salinas, Frank Martinez, Rosario Moreno, Rafael Mareno, Raul Jasso, Aracelia Jasso, Ermelando Jasso, Josefina Jasso, Teodoro Jasso, Maria Luisa Jasso, Silvia Jasso, Dora Alicia Jasso, Teodoro Jasso, Jr., Hermelin-

da Jasso, Reyna Jasso de Herrera, and Santos Herrera. The confusion evidently arose over the status of Evangelina Castro. Plaintiffs listed Evangelina Castro as a minor in the heading of their complaint, yet stated in paragraph eight of the complaint that Ms. Castro is an adult. Complaint ¶ 8. Jose Castro testified at trial that his daughter was 18 in 1983, and defendants list her in their post-trial brief as having a minimum wage claim. Defendants' Post Trial Brief at 2. The Court therefore considered Evangelina Castro as having a claim under the FLSA.

ualed or exceeded the minimum wage. The FLSA also required defendants to have prepared and maintained records documenting, among other things, the hours each plaintiff worked and plaintiffs daily starting and stopping times. 29 C.F.R. § 516.-2(a)(7) & § 516.6(a)(1); *see Williams v. Tri-County Growers, Inc.*, 747 F.2d 121, 127 (3rd Cir.1984). Although plaintiffs did not sue defendants for having failed to prepare and maintain these records, as discussed below such failure did expose defendants to liability under the FLSA's minimum wage provisions. *See Castillo v. Givens*, 704 F.2d 181, 198 n. 41 (5th Cir.1983), *cert. denied*, 464 U.S. 850, 104 S.Ct. 160, 78 L.Ed.2d 147 (1984). (The MSAWPA, moreover, contains an analogous requirement that did provide a basis for plaintiffs' suit. 29 U.S.C. § 1821(d)).

The Court's initial concern thus is whether defendants paid plaintiffs the minimum wage during the 1983 strawberry harvest. Before discussing the minimum wage claims of individual plaintiffs, however, I will discuss four legal issues that are generally pertinent to such claims.

*The Legal Framework*

▇ The first issue concerns the parties' burdens of proof. As is normal in a civil case, plaintiffs must establish their entitlement to relief under the FLSA by a preponderance of the evidence. The Supreme Court, however, recognizing that the FLSA requires the defendant-employer to keep accurate hour and wage records, and that the defendant "is in a position to know and to produce the most probative facts concerning the nature and amount of work performed", has established guidelines for shifting the burden of proof in minimum wage cases. *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 686–88, 66 S.Ct. 1187, 1191–92, 90 L.Ed. 1515 (1946). This burden-shifting process operates as follows:

> When the employer has kept proper and accurate records, the employee may easily discharge his burden by securing the production of those records. But where the employer's records are inaccu-

rate or inadequate and the employee cannot offer convincing substitutes, a more difficult problem arises. The solution, however, is not to penalize the employee by denying him any recovery on the ground that he is unable to prove the precise extent of uncompensated work. Such a result would place a premium on an employer's failure to keep proper records in conformity with his statutory duty; it would allow the employer to keep the benefits of an employee's labors without paying due compensation as contemplated by the Fair Labor Standards Act. In such a situation we hold that an employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference. The burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence. If the employer fails to produce such evidence, the court may then award damages to the employee, even though the result be only approximate....

> The employer cannot be heard to complain that the damages lack the exactness and precision of measurement that would be possible had he kept records in accordance with the requirements of § 11(c) of the Act.... [W]e are assuming that the employee has proved that he has performed work and has not been paid in accordance with the statute.... The uncertainty lies only in the amount of damages arising from the statutory violation by the employer.... It is enough under these circumstances if there is a basis for a reasonable inference as to the extent of the damages.

*Id.* at 687–88, 66 S.Ct. at 1192. Under *Anderson*, then, the Court must follow three steps in analyzing plaintiffs' minimum wage claims. Initially, it must determine whether defendants have failed to

keep accurate or adequate records. If they have failed to keep such records, the Court must decide whether plaintiffs satisfied their burden of producing evidence that a) establishes that they performed work for which they were improperly compensated, and b) allows the Court to determine the amount and extent of that work as a matter of just and reasonable inference. Plaintiffs' testimony can by itself suffice to satisfy this burden. *Williams*, 747 F.2d at 128 & n. 13. Finally, provided plaintiffs meet their burden, the Court must determine whether defendants introduced other evidence either establishing the precise amount of work plaintiffs performed or rebutting the inference to be drawn from plaintiffs' evidence.

The second issue concerns whether each plaintiff must testify as to the hours he or she worked. In this case, nine plaintiffs testified on behalf of twenty-eight claimants, although plaintiffs buttressed their claims with affidavits, depositions, and documentary evidence. The Court, of course, prefers live testimony, which allows it to judge the sincerity and credibility of plaintiffs' claims and allows the parties to fill in the gaps other methods of proof often leave. Courts have consistently held in FLSA cases, however, that some plaintiffs can testify as to the hours other, nontestifying, plaintiffs worked if they have personal knowledge of such hours. *Beliz v. W.H. McLeod & Sons Packing Co.*, 765 F.2d 1317, 1331 (5th Cir.1985); *Castillo*, 704 F.2d at 195; *Donovan v. Kaszycki & Sons Contractors, Inc.*, 599 F.Supp. 860, 868 (S.D.N.Y.1984).

■ In this case, the testifying plaintiffs properly testified as to the hours the nontestifying plaintiffs worked. The testifying plaintiffs stated that the workers generally worked the same hours and that everyone was in the fields together. Defendants did not dispute this testimony, arguing only that some workers may have entered the fields 15–30 minutes late or have left 15–30 minutes early. Defendants could not, moreover, identify which plaintiffs arrived late or left early. The same

holds true for defendants' contention that plaintiffs left the fields at various times to run personal errands, such as applying for food stamps. The Court concludes in light of this testimony that the nine testifying plaintiffs properly established the general number of hours all the plaintiffs worked. As discussed further below, moreover, this testimony established a pattern of FLSA violations by defendants and provided a basis for the Court to determine the amount of wages defendants owe plaintiffs. *See id.* at 868.

■ The third issue is whether defendants can include as part of plaintiffs' wages the reasonable cost to them of providing plaintiffs with lodging. 29 U.S.C. § 203(m). I hold they cannot. The Secretary of the Department of Labor has promulgated regulations defining reasonable cost to be "not more than the actual cost to the employer of the board, lodging, or other facilities customarily furnished by him to his employees." 29 C.F.R. § 531.3(a). The employer bears the burden of showing that he is entitled to the wage credits available under section 203(m). *Donovan v. New Floridian Hotel, Inc.*, 676 F.2d 468, 474 (11th Cir.1982). There is evidence in the record that defendants deducted ten dollars from plaintiffs' weekly wages as payment for housing expenses. There is no evidence, however, supporting defendants' entitlement to this money. The Court therefore disregarded such deductions in computing plaintiffs' minimum wage claims. *Washington v. Miller*, 721 F.2d 797, 803 (11th Cir.1983).

■ The final issue concerns whether plaintiffs are entitled to injunctive relief under the FLSA. Injunctive relief is available under the FLSA upon a proper showing. *Donovan*, 599 F.Supp. at 871–72; *see* 29 U.S.C. § 217. I find on the basis of the evidence discussed *infra* that the Court should grant plaintiffs' request for injunctive relief. Defendants have not shown why such relief would be inappropriate, and the Court believes that an injunction would help to ensure defendants' future compliance with the FLSA's minimum

wage and record keeping requirements. The Court may award injunctive relief even if defendants are not presently violating the FLSA. *Donovan,* 599 F.Supp. at 872.

### The 1983 Strawberry Harvest

■ The Court now turns to plaintiffs' minimum wage claims. I find initially, in accordance with the procedure established in *Anderson,* that defendants' work records are inaccurate and inadequate. Section 500.80 of 29 C.F.R., which is part of the MSAWPA, provides that employers must maintain the following records for migrant laborers:

(a) Each farm labor contractor, agricultural employer and agricultural association which employs any migrant or seasonal agricultural worker shall make and keep the following records with respect to each worker including the name, permanent address, and Social Security number:

(1) The basis on which wages, are paid;

(2) The number of piecework units earned, if paid on a piecework basis;

(3) The number of hours worked;

(4) The total pay period earnings;

(5) The specific sums withheld and the purpose of each sum withheld; and

(6) The net pay.

29 C.F.R. § 500.80; *see also* 29 C.F.R. § 516.2 (requirements under the FLSA). Defendants admitted they did not keep such records. They did not, among other things, keep separate wage records for each employee; mark the exact hours of work for each employee; or provide the net pay for each employee.

It is obvious from defendants' testimony, moreover, particularly the testimony of defendant Darlene Mattner, that the hours written on some of the plaintiffs' worksheets were not precise working hours but rather were based on defendants' "observations" of when particular plaintiffs happened to be in the fields. Defendant Darlene Mattner testified that she recorded these observations on slips of paper, then transferred them to the proper worksheets at the end of the pay period. She was unable to produce the slips of paper at trial, however, and she could not vouch for the complete accuracy of her field notes with regard to individual plaintiffs. Defendant admitted, moreover, that she did not attempt to keep time records for every worker herself but rather sought to have the workers keep track of their own hours on their worksheets. Defendant Darlene Mattner in addition was absent for the final week of the harvest, and her son, Kevin Mattner, kept track of plaintiffs' hours during that time. Kevin Mattner testified that he kept track only of when the first worker entered and the last worker left the fields, and made no effort to keep track of the hours of individual workers. It thus is apparent that defendants' records for the third week of the strawberry harvest are particularly inaccurate.

In summary, the Court finds that defendants failed to produce accurate and adequate records of the hours plaintiffs worked during the 1983 strawberry harvest. Courts have condemned the kind of record keeping defendants employed as not meeting the FLSA's requirements and I find that it did not do so here. *See Williams,* 747 F.2d at 127–28; *Mendez v. Brady,* 618 F.Supp. 579, 583–84 (W.D.Mich. 1985).

Having decided that defendants' records are unreliable, the Court must now determine whether plaintiffs have demonstrated that they performed work for which they were improperly compensated. In this case, the evidence concerning this issue overlapped with the evidence concerning the amount and extent of the uncompensated work plaintiffs performed. The Court thus will discuss both issues together. It is sufficient to note for the present that I relied on the following factors in determining that plaintiffs' performed work for which they were not properly compensated: (1) the field records maintained by Kevin Mattner (for the third week of the harvest) and Darlene Mattner are not completely credible as they are only a rough estimation of the hours plaintiffs worked; (2) the shed employees' time records provided the

most credible measure of the hours plaintiffs spent in the fields, and in some instances conflicted with defendants' field records; (3) there was rather uniform testimony that plaintiffs' commenced working at approximately seven o'clock (7:00) each morning; and (4) plaintiffs consistently testified that they worked in the afternoons, and defendants were unable to rebut such testimony completely.

In the absence of accurate time records, the Court found it difficult to determine how many hours plaintiffs worked. Some courts have determined the number of hours of work in this kind of case by deciding how many units an average worker can pick in one hour, then dividing that number into the total number of units picked. *E.g., Mendez*, at 587 (W.D.Mich.1985). In this case, however, neither party presented credible testimony from which the Court could determine how many carriers of berries an average worker can pick in one hour. The Court thus employed the following approach to determine how many hours plaintiffs worked.

First, I determined the maximum number of hours any one plaintiff could have worked in a particular pay period, and consequently the wage defendants would have had to pay such plaintiff to satisfy the minimum wage requirement. I then determined the number of hours each adult plaintiff worked and the wage he or she was paid for each week of the three-week 1983 strawberry harvest. This approach shows that most of the plaintiffs performed work during the 1983 strawberry harvest for which they were not properly compensated, and produces a just and reasonable measure of the amount and extent of such uncompensated work. Defendants, moreover, were unable to produce evidence either establishing the precise amount of work plaintiffs' performed or rebutting the inferences to be drawn from plaintiffs' evidence.

As the following discussion demonstrates, the minimum wage violations arose primarily during the third week of the harvest, when, according to trial testimony, the berries were scarce and difficult to pick, and plaintiffs complained they were unable to pick enough berries to make the minimum wage. In summary, plaintiffs produced credible evidence that they performed work during the 1983 strawberry harvest for which they were not properly compensated; the evidence reasonably demonstrated the amount and extent of this work; and defendants were unable either to produce more accurate evidence of plaintiffs' hours or to rebut the inferences to be drawn from plaintiffs' evidence.

The first week of the harvest ran from June 16th through June 22nd. Plaintiffs worked a maximum of 29 hours during this week, and should have received at least $97.15 in wages for such hours of work. The Court credited testimony indicating that plaintiffs worked only 1–3 hours the first two days of the harvest, and did not work at all on Saturday, the 18th. For the balance of this first week, the Court relied primarily on the hours of the shed employees in determining the number of hours plaintiffs worked. I did not credit defendants' field records of plaintiffs' hours for two reasons: (1) the shed employees' time records showed that plaintiffs worked during periods for which defendants' field records indicate they did not work; and (2) defendants' field records were inconsistent with Kevin Mattner's testimony indicating that plaintiffs did not pick at all in the afternoons the first week.

With regard to the second work week, which lasted from June 23rd to June 29th, the Court finds that plaintiffs worked a maximum of 38.25 hours and should have been paid at least $128.14 for such work. I did not credit plaintiffs with any hours of work on Saturday, the 25th, for the following reasons: (1) Kevin Mattner, Richard Mattner, and Darlene Mattner testified that plaintiffs did not work on Saturdays; (2) Martin Bass testified that the fresh market for strawberries was not open on Saturdays; and (3) only two packing shed workers, Kay Love and Larry Schultz, recorded hours for that day whereas the testimony indicated that more than two per-

sons generally worked in the shed during the fresh market season.

For the final week of the harvest, the Court finds that plaintiffs again worked a maximum of 38.25 hours, for a total minimum wage of $128.14. The Court credited defendants with a rain delay on July 1st and credited plaintiffs with work on the afternoon of July 4th. Although defendants' climatological records show that it rained on the 4th, the records do not show when the rain occurred, and shed employee time records indicate defendants probably harvested process market berries that day.

*Individual Plaintiffs' Claims*

With these general legal standards and factual guidelines in mind, the Court will now address the claims of the individual plaintiffs. I note initially that certain plaintiffs failed to introduce any evidence, oral or written, evincing either that they worked for defendants during the 1983 strawberry harvest, or, if they did work for defendants, the amount of such work. The Court accordingly cannot credit such plaintiffs with any hours worked and must deny their claims on the ground that they failed to meet their initial burden of proof under *Anderson.* The Court's findings with regard to plaintiffs' individual claims are as follows:

■ *Jesus Bueno.* Mr. Bueno received wages of $126.61 and $137.30 for the first and second weeks of the harvest, respectively. Thus, even given that he worked the maximum number of hours both weeks, he has no minimum wage claim for the first two weeks of the harvest. Mr. Bueno does, however, have a minimum wage claim of $36.76 for the third week of the harvest. The Court finds that plaintiff worked 30 hours that week but received only $63.74 in wages. I did not credit Mr. Bueno with a full work week of 38.25 hours because his rate of picking, had I done so, would have been less than one carrier per hour.

The Court, however, also cannot credit defendants' claim that Mr. Bueno worked only 18 hours that week. First, defendants have no accurate records to support that claim. The record they produced at trial was based solely on Kevin Mattner's rough estimation of Mr. Bueno's hours and they could not produce the notes on which Kevin Mattner allegedly recorded such hours. Given the number of carriers Mr. Bueno picked that week, moreover, his rate of picking based on 30 hours of work would have been about one and one-half (1½) carriers per hour, which accords well with testimony concerning the average speed of workers picking process market berries at the end of the season. Third, I must give plaintiff the benefit of the doubt due him under *Anderson* as defendants have failed to produce accurate work records. Finally, I cannot believe that with 80–110 workers in the field, defendants were able, using only rough notes, to keep track of Mr. Bueno's hours with the kind of precision they claim.

■ *Jose Castro, Juana Castro, and Evangelina Castro.* The Castros' worksheets indicate they all made the minimum wage during the first two weeks of the harvest. Their records for the third week of the harvest, however, reveal minimum wage violations. Specifically, Jose Castro can claim a violation of $26.85; Juana Castro can claim a violation of $35.85; and Evangelina Castro can claim a violation of $35.85. The Court credited each of these plaintiffs with 32 hours of work for the third week of the harvest. I based this determination on the following factors: 1) the Castros testified they all worked together, so their work times would have been the same; 2) the Castros picking speed based on 32 hours of work would have been between one to three carriers per hour, which accords with trial testimony concerning picking speeds; 3) the Court, for the reasons discussed with respect to Mr. Bueno's claim, cannot totally credit defendants' claims regarding the Castros' work hours; 4) although plaintiffs' rate of picking for this week was slower than their rate for the first two weeks of the harvest, the relative scarcity of the berries during the third week and the fact that the workers were picking primarily process market rather than fresh market berries adequate-

ly accounts for the slower speed; and 5) the Court reduced plaintiffs' hours some to reflect the contributions of Lucila Castro.

 *Linda Cerna and Francis Daughtry.* The Court finds that Linda Cerna made the minimum wage for the first two weeks of the harvest, but can claim a minimum wage violation of $19.26 for the third week. Although Linda Cerna's worksheets indicate a minimum wage violation for the first week, testimony at trial established that she did not begin work until June 19. She thus can claim a maximum of 25 hours of work for the first week, making her pay for that week sufficient to meet the minimum wage. With regard to the third week, the Court finds that Linda Cerna worked on June 30th, but was not paid for such work. Richard Mattner's testimony indicated that Ms. Cerna was fired as of June 30, and that she was working on the day she was fired. This finding corresponds, moreover, with the trial testimony of Linda Cerna and the deposition testimony of Thomas Kearny.

 The Court finds that Francis Daughtry did not work for defendants during the 1983 strawberry harvest. I discuss these two plaintiffs together because my finding that Linda Cerna made the minimum wage the first two weeks of the harvest depends on my finding that Francis Daughtry did not work for defendants during the harvest. If Francis Daughtry did work for defendants, then the Court would have to credit Ms. Cerna with only one-half (½) of the wage listed on the worksheets, which could reveal some minimum wage violations. There was conflicting testimonial and other evidence concerning whether Francis Daughtry worked for defendants. Martha Cordova testified that Ms. Daughtry lived and worked on defendants' farm, and that Ms. Cerna's daughter also worked in the fields. [The Court did not credit Ms. Cerna's daughter with any time or wages because there was insufficient evidence regarding how much work she performed.] Mr. Garcia testified, however, that there was only one white woman working in the fields that summer during the strawberry

harvest, and Kevin Mattner testified that he did not remember seeing Francis Daughtry or Ms. Cerna's daughter working in the fields. Mr. Kearney's deposition testimony regarding Ms. Cerna's firing and defendant Richard Mattner's statements at that time concerning Ms. Daughtry is probative but not conclusive on the issue. Mr. Kearney did not testify at trial and his deposition testimony is sketchy. What the Court found determinative, however, was the absence of any testimony from Ms. Daughtry—either in person or through deposition—indicating that she worked for defendants during the 1983 strawberry harvest. I thus find that plaintiffs have failed to carry their burden of proof on this issue.

*Andres Cerna.* Andres Cerna's worksheets indicate he made the minimum wage throughout the 1983 strawberry harvest. The Court thus denies his claims.

 *Ernesto Cordova, Martha Cordova, and Juanita Cordova.* The Cordovas' worksheets indicate minimum wage violations of $13.74 for each plaintiff during the first week of the harvest; no minimum wage violations during the second week; and minimum wage violations of $52.02 for each plaintiff during the third week. The decisive issue regarding the Cordova family's claim was how many persons each worksheet included. Defendants testified that each worksheet included five persons. Ernesto Cordova testified that there were seven persons on each worksheet: himself, his wife, and his five children. The June 24th worksheet lists five persons: Ernesto, on the front, and Ernesto, Jr., Olga, Eulalio, and Juana, on the back. Martha Cordova testified, moreover, that she also worked in the fields. The Court thus credits these plaintiffs with six persons per worksheet, revealing the minimum wage violations cited above. The Court does not credit the youngest child, Robert, with any work for two reasons: (1) there was no specific testimony that he worked in the fields and he was not listed on the June 24th worksheet; and (2) since he was only 12 years of age in 1983, he probably did not

contribute significantly to the family's production even if he did work. Testimony at trial indicated that the younger children helped primarily to fill their parents' baskets and to carry the baskets to the packing shed.

■ *Eli and Jesusita Gonzalez.* The worksheets of these two plaintiffs reveal no minimum wage violations. Neither of them testified at trial and they introduced only their worksheets and the testimony of others in behalf of their claims. They apparently intended to combine their output and wages on one worksheet. The worksheets for the first two weeks of the harvest clearly reveal that they did combine their output and wages and that they suffered no minimum wage violations for such weeks. The worksheet for the final week of the harvest indicates there may have been a minimum wage violation if the sheet included both plaintiffs. There is no evidence, however, demonstrating that the worksheet did include the output and wages of both plaintiffs. The June 24th worksheet listed both plaintiffs and there was a two (2) with a circle around it and hours for two persons on the July 1st worksheet. The July 8th worksheet, however, lists only Eli Gonzalez and there is no indication that Jesusita Gonzalez was included on that worksheet. Plaintiff Jesusita Gonzalez thus did not meet her burden of proving that she worked during the third week of the harvest. The Court rejects her contention that it should assume she was included on the July 8th worksheet because she was included on the other worksheets and because it was a common practice to put a husband and wife on one worksheet.

■ *Consuelo Salinas.* Testimony at trial indicated that Consuelo Salinas picked in conjunction with her daughter, Norma. The Court thus divided the wages Ms. Salinas received in half to determine whether she was paid the minimum wage. Ms. Salinas' worksheets for the first two weeks of the harvest indicate that she did not suffer any minimum wage violations. The problem is with the third week of the harvest, for which Ms. Salinas produced no work-

sheet. Ms. Salinas testified at a deposition that she had worked during the third week of the harvest. Defendant Darlene Mattner testified to the contrary at trial, stating that Ms. Salinas was in the advanced stages of a pregnancy at that time and hence did not work in the fields. The Court finds that although it is a close question, the absence of a worksheet for the third week of the harvest precludes it from ruling in plaintiff Salinas' favor. It is impossible for me to make a firm credibility judgment from the lifeless pages of Ms. Salinas' deposition transcript, and she introduced no other evidence to corroborate her deposition testimony. The Court thus finds that she has not met her burden of proof on this issue.

■ *Frank Martinez.* Mr. Martinez' worksheets reveal no minimum wage violations. The only question with regard to his claim involves the third week of the harvest, when Mr. Martinez made $203.33. If the Court were to divide such sum in half to account for the alleged work of plaintiff's son, then Mr. Martinez would have a minimum wage claim for the third week. Defendant Darlene Mattner testified at trial that plaintiff's son worked for part of the third week, but stated that he did not work the entire week. Plaintiff did not testify at trial. Although the Court, as explained above, does not credit Ms. Mattner's testimony completely, I find that plaintiff has not met his burden of proof under *Anderson* of demonstrating how much his son worked, at least as a matter of fair and reasonable inference, during third week of the harvest.

■ *Rosario Moreno and Rafael Moreno.* The Court finds that each of these plaintiffs suffered a minimum wage violation of $7.29 for the third week of the harvest. The Court divided plaintiffs' wages in two since they picked together. Their worksheets reveal no violations for the first two weeks of the harvest. Their worksheet for the third week reveals the violation stated above. The Court credited these plaintiffs with a full week of work for the third week.

■ *Raul Jasso and Aracelia Jasso.* The Court will discuss these two plaintiffs together because they claim they picked together, combined their outputs, and divided equally the wages they received. The Court notes initially that Raul and Aracelia Jasso, like the other members of the Jasso family, did not testify at trial or produce any deposition testimony in their behalf. The Court thus must adjudicate their minimum wage claims based on the work records submitted in their behalf and other plaintiffs' testimony.

The Court must deny Aracelia Jasso's claim because she did not meet her burden under *Anderson* of proving that she performed uncompensated work, or any work for that matter, for defendants. Plaintiff's name is listed on various food stamp records, but not on any worksheets, and there is no additional evidence other than the assertions of her attorneys that she worked for defendants during the 1983 strawberry harvest. It is a close question whether Ms. Jasso worked for defendants because she is listed on a worksheet dated July 22nd, and testimony at trial indicated that not all of the workers were listed on the worksheets submitted in their behalf. The Court must conclude, however, that plaintiff has not proven her claim. The Court must also deny Raul Jasso's claim because it is clear that he made the minimum wage for each week of the harvest if Aracelia Jasso is not included on his worksheets.

■ *Ermelando Jasso and Josefina Jasso.* The Court will discuss the claims of these two plaintiffs together because they submitted a joint worksheet for the third week of the season. Ermelando Jasso's worksheets for the first two weeks of the harvest (Joint Ex. V) reveal no minimum wage violations. Similarly, Josefina Jasso's worksheets for the first two weeks of the harvest (Joint Ex. W) also reveal no minimum wage violations. Plaintiffs' joint worksheet for the third week of the harvest (Joint Ex. V), however, reveals a minimum wage violation of $44.45 for each plaintiff. The Court credited each plaintiff with a full 38.25 hours of work for this week. Their picking speed given a full week of work would have been a little over one carrier per hour, which is within the range of picking speeds testified to at trial. The Court, moreover, cannot credit the testimony of Darlene Mattner and Adan Benavides regarding the work the Jasso "girls" performed, or did not perform, during this week. They did not differentiate among the "girls" with regard to when or how long they may have worked. The Court finds it slightly incredible, moreover, that Darlene Mattner could have determined that each member of the Jasso family worked 27 hours during the third week of the harvest when she stated that they missed different days and even different hours within a day. Finally, Adan Benavides testified only that he occasionally had to get the "girls" from the camp in the afternoon, not that they did not work in the afternoon.

*Teodoro Jasso, Maria Luisa Jasso, Silvia Jasso, Dora Alicia Jasso, and Teodoro Jasso, Jr.* The Court will consider the claims of these plaintiffs together because their output and pay were listed on one worksheet. Darlene Mattner testified that each worksheet included six persons, so the Court divided the wage listed on the worksheets by six to determine the wage each plaintiff received. For the reasons discussed above with respect to plaintiffs Ermelando Jasso and Josefina Jasso, moreover, the Court credited each of these plaintiffs with a full 38.25 hours of work for the last week of the harvest.

Following these guidelines, the Court finds that each of these plaintiff earned the minimum wage for the first two weeks of the harvest. Each one can claim a minimum wage violation of $31.29, however, for the third week of the harvest.

■ *Hermelinda Jasso.* The Court must deny this plaintiff's claim because she introduced no evidence regarding the work she allegedly performed during the 1983 strawberry harvest. Plaintiff claims Joint Exhibit V are her 1983 worksheets. Those sheets, however, bear the name of Erme-

lando Jasso, not Hermelinda Jasso. If they were Hermelinda's worksheets, moreover, than Ermelando's claim must fail due to lack of support.

*Reyna Jasso de Herrera and Santos Herrera.* The Court finds that these plaintiffs did not work for defendants during the 1983 strawberry harvest and thus will deny their claims. It is sufficient to state as a rationale for this decision that they produced no credible evidence to support their claims.

### Liquidated Damages

Having found that defendants did not pay certain plaintiffs the minimum wage during the 1983 strawberry harvest, the Court must now determine whether such plaintiffs can recover an additional sum equal to the amount of their unpaid minimum wages as liquidated damages. Section 216(b) of the FLSA states in part as follows:

> Any employer who violates the provisions of section 206 or section 207 of this title shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages.

29 U.S.C. § 216(b). Section 260 of the same title, however, provides:

> In any action commenced ... to recover unpaid minimum wages ... or liquidated damages, under the Fair Labor Standards Act of 1938 ..., if the employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the Fair Labor Standards Act of 1938 ... the court may, in its sound discretion, award no liquidated damages or award any amount thereof not to exceed the amount specified in section 216 of this title.

29 U.S.C. § 260. The Sixth Circuit has interpreted this section as follows:

> For the court's discretion to be invoked, however, the delinquent employer must sustain a "plain and substantial burden of persuading the court by proof that his failure to obey the statute was both in good faith and predicated upon such reasonable grounds that it would be unfair to impose upon him more than a compensatory verdict." *Rothman v. Publicker Industries, Inc.,* 201 F.2d 618, 620 (3d Cir.1953).... In the absence of such proof a District Court has no power or discretion to reduce an employer's liability for the equivalent of double unpaid wages.

*McClanahan v. Mathews,* 440 F.2d 320, 322 (6th Cir.1971) (citations omitted); *see Williams,* 747 F.2d at 129 (the employer must produce "plain and substantial evidence to satisfy the good faith and reasonableness requirements").

 I find that defendants here did not meet their plain and substantial burden of demonstrating that they acted both in good faith and on reasonable grounds. This test incorporates both a subjective and an objective standard. *Id.* The Court finds that defendants subjectively did not act in good faith. They were aware, as defendant Darlene Mattner admitted, of their obligation to pay plaintiffs the minimum wage and, more importantly, to keep track of the number of hours each plaintiff worked. They failed to meet those obligations. Darlene Mattner testified that she attempted to have the workers keep track of their own hours. Defendant must have been aware from her prior experience with migrant workers, however, that such a system would fail. At the very least, she knew by the second week of the harvest that the system would not work, yet failed to implement an alternative system.

Defendants' apparent effort to keep track of the number of hours each worker spent in the fields through the use of notes was equally ineffective. Many workers, moreover, have no separate records of their output, hours, or wages. Without these kinds of records, the Court fails to see how defendants can claim they attempted in good faith to comply with the FLSA's requirements. For these same reasons, the

Court also finds that defendants failure to obey the statute was not predicated on reasonable grounds. The Court sympathizes with defendants difficult task of keeping track of the hours and wages of 80–110 migrant workers. That nevertheless is their legal obligation and they clearly did not take reasonable steps during the 1983 strawberry harvest to comply with the law. The Court therefore will award the appropriate plaintiffs liquidated damages as provided for in section 216(b). I will also note that I reject defendants' argument that plaintiffs' claims are *de minimis*. Compare *Hill v. United States*, 751 F.2d 810, 814–15 (6th Cir.1984) (infrequent and minimal interruptions during lunch period are subject to *de minimis* doctrine), *cert. denied,* —— U.S. ——, 106 S.Ct. 63, 88 L.Ed.2d 51 (1985); *Lindow v. United States*, 738 F.2d 1057, 1062–64 (9th Cir. 1984) (daily periods of approximately ten minutes found to be *de minimis* ). The Court, moreover, will grant plaintiffs' request for injunctive relief and will enjoin defendants from committing future violations of the FLSA's minimum wage requirements.

### Plaintiffs' Retaliation Claim

Plaintiffs brought claims of retaliatory discharge under the FLSA on behalf of the Castro family, the Jasso family, and the Gonzalez family. *See* 29 U.S.C. § 215(a)(3). Plaintiffs, for good reason, barely discussed these claims in their post-trial briefs, devoting only one paragraph to them. The record is simply devoid of any credible evidence that defendants fired these plaintiffs on or about July 25, 1983, in retaliation for such plaintiffs having filed minimum wage complaints against them. The Court therefore will deny these plaintiffs' claims of retaliatory discharge.

### Plaintiffs' MSAWPA Claims

Plaintiffs predicate their second ground for relief on the Migrant and Seasonal Agricultural Worker Protection Act.[2] Congress enacted this statute, which evolved out of the Farm Labor Contractor Registration Act of 1963 ("FLCRA"), in an effort to strengthen FLCRA's protections for migrant farm workers. H.R.Rep. No. 97–885, 97th Cong., 2d Sess. 1, *reprinted in* 1982 U.S.Code Cong. & Ad.News 4547, 4547–50. The portions of the Act that relate to this case require agricultural employers to comply with certain informational and record-keeping requirements and to ensure the safety and sanitation of migrant housing. 29 U.S.C. §§ 1821 & 1823.

Defendants admit that they did not comply with the following provisions of the Act: (1) sections 1821(a)(1)–(4); (2) section 1821(b); and (3) section 1821(d)(2). The parties contest defendants' compliance with the Act's other provisions. Defendants argue, moreover, that they fall within the Act's family business exemption and thus need not comply at all with the Act's requirements. They also argue that even if the Court finds that they are not covered by this exemption and thus have violated the Act, it should not assess any damages against them because such violations were not intentional.

The Court will divide its discussion of plaintiff's claims under the Act into three areas: (1) whether defendants fall within the family business exemption; (2) if they do not, what provisions of the Act did defendants violate; and (3) were such violations intentional. I note initially that because the Act is a remedial statute designed to protect migrant workers, I must construe its provisions broadly so as to effectuate Congress' remedial intent. *Soliz v. Plunkett*, 615 F.2d 272, 275–76 (5th Cir.1980) (decision under the FLCRA); *Marshall v. Coastal Growers Association,*

2. The Court did not consider the MSAWPA claims of those persons whom it found did not work for defendants during the 1983 strawberry harvest for purposes of the FLSA. Specifically, as discussed above, the Court has found that plaintiffs did not establish that Francis Daugh-

try, Aracelia Jasso, Hermelinda Jasso, Reyna Herrera, or Santos Herrera worked for defendants during the 1983 strawberry harvest. The Court thus did not consider such plaintiffs' claims under either the FLSA or the MSAWPA.

598 F.2d 521, 525 (9th Cir.1979) (FLCRA decision). The Court correspondingly will construe narrowly exemptions available under the Act. *See Luther v. Z. Wilson, Inc.,* 528 F.Supp. 1166, 1171 (S.D.Ohio 1981) (decision under the FLSA).

### Family Business Exemption

■ Section 1803(a)(1) exempts the following group of persons from the Act's requirements:

(1) Family business exemption.—Any individual who engages in a farm labor contracting activity on behalf of a farm ... which is owned or operated exclusively by such individual or an immediate family member of such individual, if such activities are performed only for such operation and exclusively by such individual or an immediate family member....

29 U.S.C. § 1803(a)(1). The Act's legislative history clarifies that a business or farm can claim the benefit of this exemption only if any farm labor contracting activity performed for such business or farm "is performed exclusively by [an] immediate family member[ ].... " H.R.Rep. 97–885 at 10, *reprinted in* 1982 U.S.Code Cong. & Ad.News at 4556. Section 1802(6) defines a "farm labor contracting activity" as the act of "recruiting, soliciting, hiring, employing, furnishing, or transporting any migrant or seasonal agricultural worker." 29 U.S.C. § 1802(6). I note that this definition is in the disjunctive: any one of these activities would constitute a farm labor contracting activity.

After careful consideration of all the evidence, the Court finds that defendants cannot claim the benefit of this exemption. I conclude that the evidence demonstrates that persons other than defendants or their immediate family members performed farm labor contracting activities on defendants' behalf. I do not reach this conclusion without some doubt. I believe, however, that a contrary result would eviscerate the protections available under the Act; I further believe that a preponderance of the evidence supports my finding that defendants are not entitled to the exemption.

The Court reaches this conclusion for two reasons. First, it finds that Adan Benavides performed farm labor contracting activities on defendants' behalf. The evidence shows that defendants implicitly or explicitly authorized Mr. Benavides to bring workers with him to their farm and that Mr. Benavides was at least partially in charge of his "crew". I find that Mr. Benavides' activities were not, as defendants argue, merely a "frolic" or "detour" on his part, but were performed pursuant to defendants' authorization, or at least with defendants' knowledge and acquiescence. I am convinced from listening to Mr. Benavides' testimony at trial and from reading his deposition that defendants gave him the impression that he would have seven houses to fill at the camp, and that Mr. Benavides accordingly brought workers with him from Florida to fill such houses. The Court relied on the following in reaching these conclusions:

1. The Court did not find defendant Darlene Mattner's attempts to disassociate defendants from Mr. Benavides' activities to be credible. I find it difficult to believe that defendants, as they claim, did not have an employment contract with Mr. Benavides prior to his arrival at their farm. The Court finds, moreover, that at some point during their telephone conversations with Mr. Benavides during the spring of 1983, defendants authorized Mr. Benavides to bring workers with him to their farm. Testimony indicating that Mr. Benavides supervised or dealt with particular workers further supports this finding.

2. The following plaintiffs testified that Mr. Benavides brought workers with him from Florida or otherwise performed activities inconsistent with defendants' contention that he acted merely as a "field supervisor": Jose Castro testified that Mr. Benavides was his supervisor and had brought persons with him from Florida; Andres Cerna testified that Mr. Benavides showed his family to their housing; Ernesto Cordova testified that Mr. Benavides hired his family and showed them to their housing (the Court credits plaintiffs' testimony regarding the Cordova incident); Martha Cor-

dova corroborated Ernesto Cordova's testimony; Auturo Garcia, one of defendants' witnesses, testified that Mr. Benavides brought three or four families with him from Florida; Rafael Moreno testified that Mr. Benavides brought him to the Mattners; and Jesus Bueno testified that Mr. Benavides brought him to the Mattners and paid him his weekly wages.

3. Adan Benavides testified at trial and at his deposition that defendants authorized him to fill seven houses. The Court does not find Mr. Benavides' testimony to be completely credible, but it is sufficiently supported by other testimony that I cannot discredit it completely.

4. Defendant Darlene Mattner testified that defendants accepted the Moreno family as workers knowing that Adan Benavides had recruited them. The Court does not believe that the fact that Mr. Moreno is Mr. Benavides' brother-in-law means that Mr. Benavides did not perform a farm labor contracting activity for defendants.

Defendants cannot claim the benefit of the family business exemption, and thus escape liability under the Act, by arguing that they never explicitly authorized others to perform farm labor contracting activities on their behalf when they accepted the benefit of migrant labor brought to their farm through the efforts of other workers. Defendants' acceptance of some workers with the knowledge that they were there because of Mr. Benavides' efforts precludes them from claiming the benefit of this exemption.

The Court also finds that other workers in addition to Mr. Benavides performed farm labor contracting activities on defendants' behalf. Other migrant workers recruited or solicited many of the migrants who worked on defendants' farm during the 1983 strawberry harvest. Defendants were aware, moreover, of this recruitment and solicitation. Defendant Darlene Mattner testified that defendants would hire new workers who would arrive with repeat help, and Mr. Cerna testified that a friend of his had told him about the Mattners. The Court therefore finds that defendants at least tacitly allowed others to perform farm labor contracting activities on their behalf, and thus do not fall within the family business exemption.

*Defendants' Violations*

The next question the Court must consider is whether defendants violated any of the Act's provisions. The following provisions relate to this issue:

§ 1821(a) Each farm labor contractor, agricultural employer, and agricultural association which recruits any migrant agricultural worker shall ascertain and disclose in writing to each such worker who is recruited for employment the following information at the time of the worker's recruitment:

(1) the place of employment;

(2) the wage rates to be paid;

(3) the crops and kinds of activities on which the worker may be employed;

(4) the period of employment;

(5) the transportation, housing, and any other employee benefit to be provided, if any, and any costs to be charged for each of them;

(6) the existence of any strike or other concerted work stoppage, slowdown, or interruption of operations by employees at the place of employment; and

(7) the existence of any arrangements with any owner or agent of any establishment in the area of employment under which the farm labor contractor, the agricultural employer, or the agricultural association is to receive a commission or any other benefit resulting from any sales by such establishment to the workers.

(b) Each farm labor contractor, agricultural employer, and agricultural association which employs any migrant agricultural worker shall, at the place of employment, post in a conspicuous place a poster provided by the Secretary setting forth the rights and protections afforded such workers under this chapter, including the right of a migrant agricultural worker to have, upon request, a

written statement provided by the farm labor contractor, agricultural employer, or agricultural association, of the information described in subsection (a) of this section. Such employer shall provide upon request, a written statement of the information described in subsection (a) of this section.

(c) Each farm labor contractor, agricultural employer, and agricultural association which provides housing for any migrant agricultural worker shall post in a conspicuous place or present to such worker a statement of the terms and conditions, if any, of occupancy of such housing.

(d) Each farm labor contractor, agricultural employer, and agricultural association which employs any migrant agricultural worker shall—

(1) with respect to each such worker, make, keep, and preserve records for three years of the following information:

(A) the basis on which wages are paid;

(B) the number of piecework units earned, if paid on a piece-work basis;

(C) the number of hours worked;

(D) the total pay period earnings;

(E) the specific sums withheld and the purpose of each sum withheld; and

(F) the net pay; and

(2) provide to each such worker for each pay period, an itemized written statement of the information required by paragraph (1) of this subsection.

18 U.S.C. §§ 1821(a)–(d). Defendants admit that they violated sections 1821(a)(1)–(4), 1821(b), and 1821(d)(2). With respect to section 1821(b), however, defendants argue that the Court should excuse their violation of this section because the Secretary had not provided the requisite poster for them to use during the summer of 1983. Defendants also contend, moreover, that they did not violate sections 1821(c) and 1821(d)(1).

The Court finds that defendants admission of having violated sections 1821(a)(1)–(4) of the Act is well-founded. The evi-

dence demonstrates that defendants did not provide the written disclosures that section requires. I also find, moreover, that defendants—with regard to the disclosure of housing costs—violated subsection 1821(a)(5) as well as the previous four subsections. Defendants apparently argue with regard to this subsection that they provided the requisite disclosure on the food stamp forms they filled out for plaintiffs. Defendants make this same argument with regard to their alleged violation of section 1821(c).

The Court must reject this argument for two reasons. First, with respect to section 1821(a)(5), even if such records could constitute the requisite written disclosure, the food stamp records defendants introduced at trial do not indicate that plaintiffs received such information at the time of recruitment, as the section requires. Second, with respect to both section 1821(a)(5) and section 1821(c), defendants' documentary evidence does not indicate that each worker received written notice of the terms and conditions of the housing. I thus find that defendants failed to comply with subsection 1821(a)(5) as well as subsections 1821(a)(1)–(4).

Section 1821(a), however, protects only those workers whom defendants recruited for employment. Defendants presented no argument concerning the recruitment requirement. Plaintiffs stated in their post-trial brief that defendants recruited plaintiffs Jose Castro, Juana Castro, Evangelina Castro, Nieves Castro, Lucila Castro, Eli Gonzalez, Jesusita Gonzalez, Frank Martinez, Consuleo Salinas, Ronald Belmarez, and Norma Belmarez. The Court finds that the evidence supports plaintiffs' argument. It also finds that defendants recruited—as that term is used in the Act—most, if not all, of the plaintiffs for the 1983 strawberry harvest.

The Act's legislative history indicates that the term "recruits" encompasses activities that "run[ ] the spectrum from the actual pre-employment discussions between the recruiter and the migrant worker to the

filing of job orders with the interstate recruitment system established by the Wagner-Peyser Act." H.R.Rep. No. 97–885 at 13, *reprinted in* 1982 U.S.Code Cong. & Ad.News at 4559. Recruit is defined in part, moreover, as "to secure the services of...." *Webster's New Collegiate Dictionary* 959 (1979).

Inasmuch as defendants argue that they personally talked to every plaintiff before "securing their services", the Court concludes that they "recruited" such persons and thus were required to disclose the information listed in section 1821(a). The Court thus finds that most, if not all, of the plaintiffs can claim a violation of section 1821(a). As discussed below, moreover, I do not believe that such violations were mere technical violations of the Act's requirements. A potential employee needs information concerning the terms and conditions of employment to make an informed judgment concerning the desirability of the employment opportunity.

■ Plaintiffs next allege that defendants failed to post the poster specified in section 1821(b). Defendants admit they failed to comply with section 1821(b), but argue that the Court should excuse such failure because the required poster was not available during the 1983 strawberry harvest. The Court finds that defendants' argument is well-founded. Plaintiffs introduced no evidence that the poster was available during the 1983 harvest, and the Court concludes from defendants' evidence that it was not available at that time. The final regulation specifying the form for such poster was not published, for example, until August 23, 1983. The Court thus believes that defendants did not violate section 1821(b).

The Court does find, however, that defendants violated section 1821(c). Defendants argue that they disclosed the terms and conditions of plaintiffs' occupancy of their housing on plaintiffs' food stamp forms. The Court rejects this argument for the reasons discussed above. In particular, defendants did not establish that each worker received information concerning the terms and conditions of housing. The Court also finds that defendants did not, alternatively, post a statement of the terms and conditions of housing in a conspicuous place. Testimony at trial indicated that defendants, at most, may have posted information concerning the use of the showers.

■ Defendants admit that they violated section 1821(d)(2), which requires them to provide to each worker for each pay period "an itemized written statement" of the information required by section 1821(d)(1). Section 1821(d)(1) requires defendants to make, keep, and preserve records regarding the wage history of each worker. There appear to be two issues concerning defendants attempt to comply with section 1821(d)(1): (1) whether defendants prepared and preserved the appropriate records for each worker; and (2) whether such records contained an accurate statement of the number of hours worked. The Court finds that defendants violated section 1821(d)(1) on both grounds. The evidence demonstrated that defendants did not keep detailed and accurate records in accordance with this section for each plaintiff. The records defendants did prepare and maintain, moreover, often lacked accurate information concerning the workers' hours. Defendants argue that their wage records adequately reflect the number of hours plaintiffs worked. The Court discussed this issue with respect to plaintiffs' FLSA claims and I will not repeat that discussion here. It is sufficient to note that the Court has found that defendants' records of plaintiffs' hours were not adequate under the FLSA and *Anderson,* let alone specific enough to meet section 1821(d)(1)'s requirements. I also find that defendants' violation of section 1821(d) was serious; maintenance of proper records could have prevented much of the controversy that gave rise to the present action.

### The Intentionality Requirement

The next issue the Court must resolve is whether the above violations were inten-

tional. Section 1854(c)(1) of the Act provides as follows:

> (1) If the court finds that the respondent has intentionally violated any provision of this chapter or any regulation under this chapter, it may award damages up to and including an amount equal to the amount of actual damages, or statutory damages of up to $500 per plaintiff per violation, or other equitable relief....

29 U.S.C. § 1854(c)(1). Defendants' argument with regard to this section is simple: They could not have intentionally violated the Act because they did not know of the Act's existence or provisions until plaintiffs' attorneys contacted them regarding this action. Plaintiffs respond that section 1854(c)(1) does not require that defendants have had a specific intent to violate the Act's provisions, but rather employs the general civil law standard of intent, under which a person is held responsible for the natural consequences of his or her actions. *See Salazar-Calderon v. Presidio Valley Farmers Association,* 765 F.2d 1334, 1345 (5th Cir.1985), *petition for cert. filed,* — U.S. —, 106 S.Ct. 1245, 89 L.Ed.2d 353 (1985); *see also De La Fuente v. Stokely-Van Camp, Inc.,* 713 F.2d 225, 238 (7th Cir.1983) (the term intentionally as used in this section " 'means conscious or deliberate and does not require a specific intent to violate the law' ") (*quoting Alvarez v. Joan of Arc, Inc.,* 658 F.2d 1217, 1224 (7th Cir. 1981)).

■ For two reasons, the Court finds that defendants intentionally violated the Act's requirements. First, as a matter of law, defendants' alleged lack of actual knowledge of the Act's applicability and requirements does not preclude the Court from finding that an intentional violation occurred. Defendants acknowledge that the civil law standard of intent applies under the Act, but argue that even under this standard "at least an 'awareness' of the existence of the statute" is a prerequisite to liability. Defendants' Post Trial Brief at 42. There is some case law that would appear to support defendants' position. *See, e.g., Rivera v. Adams Packing Associ-*

*ation, Inc.,* 707 F.2d 1278, 1283 (11th Cir. 1983) (intentional violation found where defendant was aware of the Act's provisions); *Castillo,* 704 F.2d at 198 (defendants' testimony established that he was aware of the Act's requirements).

Defendants have not produced any cases, however, holding that a person in their position could not commit an intentional violation of the Act. I believe, moreover, that such a holding would evince an erroneous interpretation of the Act's requirements. *See Salazar-Calderon,* 765 F.2d at 1345 & n. 5 (court rejected argument that defendant could not have committed an intentional violation of FLCRA, the Act's predecessor, absent knowledge of the Act's existence and requirements); *De La Fuente,* 713 F.2d at 238 (defendants' erroneous belief that it was exempt from the Act's requirements did not make its violation unintentional). I find that defendants intentionally failed to provide plaintiffs with the information required by section 1821(a) at the time of recruitment; intentionally failed to post or otherwise to provide the terms and conditions of housing as required by section 1821(c); and intentionally failed to comply with the information and recordkeeping requirements of section 1821(d). Defendants do not argue that they negligently or carelessly failed to take the steps required to comply with these provisions of the Act. Defendants thus intentionally violated the Act's provisions. *See Salazar-Calderon,* 765 F.2d at 1345 n. 5 (the Act focuses on "the deliberateness of the conduct involved, not the defendant's knowledge of the Act").

■ I hold as an alternative ground for my decision that the evidence showed that defendants were, or should have been, aware of the Act's existence and possible application to them before the start of the 1983 strawberry harvest. The January 1983 edition of the *Great Lakes Vegetable Growers News,* which defendants admit to having received but disclaim having read, carried a fairly lengthy story on the Act and its effect on growers. Ronald Gaskill,

from the Farm Bureau, testified that the May 1983 edition of *Rural Living*, another magazine defendants admit to having received but disclaim having read, carried a three paragraph announcement regarding the Act. Although not widely disseminated, information from which defendants did or could have learned of the Act's existence and application to them was available and in circulation during the spring of 1983. Given their lengthy connection with the industry, defendants' claims of having been completely ignorant of the Act's existence and requirements are less than credible. There is sufficient evidence in the record for the Court to conclude that defendants were aware of the Act's existence and possible application to them in the spring and summer of 1983. I thus find on this ground also that defendants intentionally violated the Act.

### Statutory Damages

The final determination the Court must make is how much to compensate plaintiffs for defendants' violations of the Act. Plaintiffs are not claiming any actual damages, but have chosen instead to rely on the Act's statutory damages provision. *See Alvarez v. Joan of Arc, Inc.*, 658 F.2d 1217, 1224 (7th Cir.1981) (a court can award liquidated damages even absent a showing of actual injury). This provision has a dual purpose. First, it allows plaintiffs to recover for harm they have suffered even when they cannot prove actual injury. Second, it promotes compliance with the Act's requirements and deters future abuses. *Beliz*, 765 F.2d at 1332. The Fifth Circuit has summarized the considerations relevant to determining what level of damages would suffice to deter future violations as follows:

> Deterrent effect may be achieved without awarding exemplary damages. Whether an award accomplishes this purpose, in addition to affording compensation, is determined by considering not only the amount allowed to each plaintiff for each violation but also the total amount of the award, the nature and persistence of the violations, the extent

of the defendant's culpability, damage awards in similar cases, the defendant's ability to prevent future violations of the Act, the substantive or technical nature of the violations, and the circumstances of each case. Plainly, it ought not to be cheaper to violate the Act and be sued than to comply with the statutory requirements. Nor should a worker who sues for violations find recovery inadequate to cover his personal costs in filing suit, testifying, and paying attendant attorney's fees, recovery of which is not allowed by the Act. Further, the legislative history of the Act notes that farm workers who attempt to assert their rights must overcome a general background of fear and intimidation caused by the widespread practice of retaliation against those who complain about violations. Awards should be adequate to encourage workers to assert their statutory rights.

*Id.* at 1332–33 (citations omitted). A court should also consider "the total number of plaintiffs involved, the total number of violations, and the total amount that will be exacted from the delinquent defendant." *Id.* at 1333.

■ In deciding what level of damages to award plaintiffs, the Court considered the following factors: (1) defendants' unexcused failure to comply with most of section 1821's information and recordkeeping requirements; (2) that defendants' failure to have kept accurate time and wage records for each plaintiff caused plaintiffs to have to file suit to recover wages due them under the FLSA; (3) that defendants may not have knowingly or willfully violated the Act; (4) defendants ability to prevent future violations of the Act; (5) that each of the thirty-seven plaintiffs suffered in some respect from defendants' violations of the Act; (6) that a substantial award may be necessary to deter future violations of the Act's provisions; (7) that defendants were aware before the start of the 1983 strawberry harvest of their obligation to keep accurate records of the hours each plaintiff worked; and (8) the recent nature

of the changes in the law that led to defendants' liability. Given these factors, the Court believes that an award of $300.00 per plaintiff, or approximately $75.00 per plaintiff per violation, is adequate both to compensate plaintiffs for their injuries and to deter future violations of the Act. Although this award is at the low end of the scale, I believe it is appropriate given the "technical" nature of many of the violations; the aggregate amount of the award; and the absence of proof regarding defendants' continuing failure to comply with the Act's requirements.

### Attorneys' Fees

■ One final matter the Court must consider is plaintiffs' entitlement to attorney's fees under the FLSA. The FLSA provides that a court shall, in addition "to any judgment awarded to the plaintiff or plaintiffs, allow a reasonable attorney's fee to be paid by the defendant, and costs of the action." 29 U.S.C. § 216(b). In accordance with this provision, the Court will award plaintiffs the fees and costs they incurred in connection with their FLSA claims. The Court will employ the following procedure in determining the amount of such fees and costs: (1) within fifteen (15) days from the date of this opinion, plaintiffs' attorneys shall submit a statement to the Court setting forth the number of hours they spent on the FLSA claims upon which plaintiffs prevailed; (2) this statement shall include a detailed listing of the specific activities to which such time was devoted and of plaintiffs' attorneys' expenses; (3) plaintiffs' attorneys shall submit an affidavit verifying that the hours they claim were reasonably necessary to prepare and try the FLSA claims; (4) plaintiffs' attorneys shall also submit affidavits setting forth what they believe to be a reasonable hourly rate for their services, giving due regard in particular to their competence, prevailing legal rates in the community, and the novelty or difficulty of the issues presented; with regard to the second of these factors, plaintiffs' attorneys shall submit affidavits from three lawyers in the community regarding prevailing hourly rates; (5) defendants will have fifteen (15) days from their receipt of plaintiffs' statement and affidavits to respond to such materials. The Court will then decide on an appropriate award. The parties shall also brief any relevant legal issues regarding plaintiffs' fee application.

## APPENDIX

| Plaintiff | Unpaid Wage | FLSA Liquidated Damages | MSAWPA Award | Total |
|---|---|---|---|---|
| Jesus Bueno | $36.76 | $36.76 | $300.00 | $373.52 |
| Jose Castro | $26.85 | $26.85 | $300.00 | $353.70 |
| Juana Castro | $35.85 | $35.85 | $300.00 | $371.70 |
| Evangelina Castro | $35.85 | $35.85 | $300.00 | $371.70 |
| Linda Cerna | $19.26 | $19.26 | $300.00 | $338.52 |
| Francis Daughtry | — | — | — | — |
| Andres Cerna | — | — | $300.00 | $300.00 |
| Ernesto Cordova | $65.76 | $65.76 | $300.00 | $431.52 |
| Martha Cordova | $65.76 | $65.76 | $300.00 | $431.52 |
| Juanita Cordova | $65.76 | $65.76 | $300.00 | $431.52 |
| Eli Gonzalez | — | — | $300.00 | $300.00 |
| Jesusita Gonzalez | — | — | $300.00 | $300.00 |
| Consuelo Salinas | — | — | $300.00 | $300.00 |
| Frank Martinez | — | — | $300.00 | $300.00 |
| Rosario Moreno | $7.29 | $7.29 | $300.00 | $314.58 |
| Rafael Moreno | $7.29 | $7.29 | $300.00 | $314.58 |
| Raul Jasso | — | — | $300.00 | $300.00 |

| Plaintiff | Unpaid Wage | FLSA Liquidated Damages | MSAWPA Award | Total |
|---|---|---|---|---|
| Aracelia Jasso | — | — | — | — |
| Ermelando Jasso | $44.45 | $44.45 | $300.00 | $388.90 |
| Josefina Jasso | $44.45 | $44.45 | $300.00 | $388.90 |
| Teodoro Jasso | $31.29 | $31.29 | $300.00 | $362.58 |
| Maria Jasso | $31.29 | $31.29 | $300.00 | $362.58 |
| Silvia Jasso | $31.29 | $31.29 | $300.00 | $362.58 |
| Dora Jasso | $31.29 | $31.29 | $300.00 | $362.58 |
| Teodoro Jasso, Jr. | $31.29 | $31.29 | $300.00 | $362.58 |
| Hermelinda Jasso | — | — | — | — |
| Reyna Herrera | — | — | — | — |
| Santos Herrera | — | — | — | — |
| Nieves Castro | — | — | $300.00 | $300.00 |
| Lucila Castro | — | — | $300.00 | $300.00 |
| Olga Cordova | — | — | $300.00 | $300.00 |
| Ernesto Cordova | — | — | $300.00 | $300.00 |
| Euladio Cordova | — | — | $300.00 | $300.00 |
| Robert Cordova | — | — | $300.00 | $300.00 |
| Ronaldo Belmarez | — | — | $300.00 | $300.00 |
| Norma Belmarez | — | — | $300.00 | $300.00 |
| Olga Jasso | — | — | $300.00 | $300.00 |
| Total Damages | | | | $10,823.56 |